586 F.2d 593
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dennis CHANDLER, Claude Wayne Cole, Robert Lee Folsom,
Curtis Morrow, Alan Wayne Thompson, Duel Bowling, Dorman
Chandler, Sam Alta Dryden, Jimmy Doyle Folsom, Clarence
Newborn, Buren Robinson, Sammy Robinson, Travis Williams and
James Richard George, Defendants-Appellants.
 No. 77-5562.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 21, 1978.
 
 David E. Krisher, Atlanta, Ga., for Chandler.
 P. Bruce Kirwan, Atlanta, Ga., for Cole.
 Donald B. Howe, Jr., Tallapoosa, Ga., for Folsom.
 Benjamin Lande, Atlanta, Ga. (Court-appointed), for Morrow.
 Thomas C. Bianco, Atlanta, Ga. (Court-appointed), for Thompson.
 Edward T. M. Garland, Atlanta, Ga., for Bowling, Dorman C. Dryden, Folsom, Newborn, Robinson, Robinson, Williams and George.
 Jerome J. Froelich, Jr., William F. Bartee, Jr., Asst. U. S. Attys., William L. Harper, U. S. Atty., Atlanta, Ga., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before BROWN, Chief Judge, TUTTLE and THORNBERRY, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 In December, 1976, a federal grand jury for the Northern District of Georgia indicted thirty-one individuals on nine counts charging conspiracy and substantive offenses for the theft, interstate transportation, and receipt of gasoline from interstate pipelines. This mammoth case concerned three illegal taps on interstate gasoline pipelines in the vicinity of Tallapoosa, Georgia. According to the government's theory of the case, the scheme was run by a central core of organizers and financial backers supported by a working group that tapped the pipelines and delivered the stolen gas to a receiving and selling group of gasoline station owners and operators.
 
 
 2
 All of the defendants were charged in Count One under 18 U.S.C. § 371, with conspiracy to steal, transport, and receive gasoline from an interstate pipeline in violation of 18 U.S.C. §§ 659 and 2314. Count Two charged all of the defendants with aiding and abetting the interstate transportation of stolen gasoline valued in excess of $5,000 in violation of 18 U.S.C. § 2314. Counts Three through Nine charged various defendants with the substantive offenses of theft or receipt of gasoline from an interstate pipeline in violation of 18 U.S.C. § 659.
 
 
 3
 The government dismissed its case against three defendants (their key witness and his two children), five entered pleas of guilty, and one was severed for health reasons. The remaining twenty-two defendants went to trial in the Northern District of Georgia. Two received directed verdicts of acquittal at the close of the government's case. Of those defendants whose case actually went to the jury, three were acquitted and the other seventeen were found guilty on various counts. Three of those found guilty did not file notice of appeal; the other fourteen are before us now. All of the appellants were convicted on the conspiracy count and all but five Duel Bowling, Claude Wayne Cole, Robert Lee Folsom, Curtis Morrow, and Sammy Robinson were convicted of one or more of the substantive charges in counts two through nine. They received sentences ranging from six months to twenty years.
 
 
 4
 I. Facts.
 
 
 5
 The backbone of the government's case was the testimony of Millard Mann, an indicted coconspirator whose case was dismissed in exchange for his testimony. This testimony gave an inside view of the operation upon which the rest of the case was built. Although the appellants attack Mann's credibility, we are required to view the evidence in the light most favorable to the government, accepting all reasonable inferences and credibility choices which would support the jury's verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Villarreal, 546 F.2d 1145 (5th Cir.) (per curiam), Cert. denied, 431 U.S. 917, 97 S.Ct. 2181, 53 L.Ed.2d 228 (1977). Therefore, we find that there was sufficient evidence from which the jury could have found that the following facts existed.
 
 
 6
 In the spring of 1976, Millard Mann heard Dorman Chandler discussing the tapping of a gasoline pipeline. Such a scheme had often been the topic of idle conversation, but Chandler felt he had a way to bring it into operation. The next day Mann saw Dorman Chandler, Sam Alta Dryden, and two "others" at "Alta" Dryden's store.[1] At this meeting, the seed group agreed to an illegal gasoline pipeline tapping scheme: Dorman Chandler would manage the operation, Sam Alta Dryden would provide the financial support, and Mann would sell the stolen gasoline for forty cents a gallon to local service station owners and receive a five cent a gallon commission. Dorman Chandler said that a tap site had been located in Alabama and that he, Dennis Chandler, Alan Wayne Thompson, and others had successfully tapped the pipeline. A delivery system was arranged whereby the gasoline would be taken from the pipeline, put into one of four custom-rigged farm trucks, and taken directly to the receiving gasoline station for a late night delivery directly into the station's storage tanks. The tappings and deliveries would be performed by Dorman Chandler, Dennis Chandler, Alan Wayne Thompson, Claude Wayne Cole, and others. All deliveries would take place between ten p. m. and six a. m.
 
 
 7
 There were three known taps: the first in Cleburne County, Alabama; the next near Villa Rica, Georgia; and the last near Temple, Georgia. Although Mann was an active participant only at the Temple tap site, he was able to testify from conversations with Dorman Chandler, Sam Alta Dryden, and other members of the conspiracy that a substantially similar procedure brought all three into operation. When a suitable piece of property with access to the pipeline was located, Dorman Chandler and Sam Alta Dryden would approve it. After the property was leased, a crew would go out to tap the pipeline. Mann identified the following appellants as participants in the various tapping operations: Dorman Chandler, Dennis Chandler, Alan Wayne Thompson and Claude Wayne Cole.
 
 
 8
 Mann also identified several appellants as participants in the delivery operation. He told of witnessing various late night gasoline "dumpings" from the custom rigged trucks by appellants Dennis Chandler and Alan Wayne Thompson. Deliveries were observed at the following gasoline stations: Travis Williams' Shell, Buran Robinson's Standard, Curtis Morrow's Union 76, James George's independent station, and the Union 76 station managed by Clarence Newborn. While the deliveries were always between ten p. m. and six a. m., most were between three and six a. m., when the stations were closed. The individual making the delivery usually would be the only person at the station; however, on two occasions when Mann was present, assistant chief of police Robert Lee Folsom drove through the stations while gas was being "dumped" from the trucks into the storage tanks. Mann once heard Dorman Chandler state that the operation was delivering between 2,000 and 7,000 gallons of gas a night.
 
 
 9
 Two Tallapoosa police officers also witnessed clandestine gasoline deliveries from late May through July, 1976. One night in May, 1976, Officer Joe Williams observed a truck in the Union 76 station managed by Clarence Newborn. When he pulled his police car into the station, it appeared that someone was stealing gasoline from the station's tank. Dorman Chandler appeared from behind the truck and, when asked by Officer Williams if he was stealing gas, replied that he was delivering it. Again, one night in early June, Officer Williams saw the same truck at the same station with a hose going from the truck into the station's storage tanks. No one was around and gasoline was overflowing into the street. Williams called the fire department and the station's manager, Clarence Newborn. Shortly after Newborn arrived, Dorman Chandler appeared and talked with Newborn as he cleaned the spill. Williams then left for five minutes and when he returned, the delivery truck, Newborn, and Chandler were gone. Officer Williams reported this incident to the chief of police, Jimmy Doyle Folsom, who told Williams not to concern himself because "the state" was working on the case. Later, when Williams was talking on the police radio about the spill, Chief Folsom told him to stop because it might damage "the state's case." In fact, no state or federal agency was aware of the illegal gas operation at that time.
 
 
 10
 Officer Williams also observed similar clandestine deliveries at Sammy Robinson's Shell, Buran Robinson's Standard, Travis Williams' Shell and James George's independent station. Officer Elmer Robinson testified that he had seen these various delivery trucks on many occasions, usually with someone standing around them, at Travis Williams' Shell, Sammy Robinson's Shell, and James George's independent station, between midnight and five a. m. during the summer months of 1976.
 
 
 11
 In mid-July, 1976, Vance Posey, a Georgia Department of Revenue Agent, became aware of the gasoline operation through conversations with Millard Mann, and later with Officers Robinson and Williams. He began surveillance on July 19, 1976, when he observed one of the delivery trucks in the Tallapoosa Union 76 station managed by Clarence Newborn. He followed the truck into Alabama before losing it about a mile from what was later found to be the Alabama tap site. Upon returning to Tallapoosa, Agent Posey discovered another one of the delivery trucks and followed it to Curtis Morrow's 76 station in Fruithurst, Alabama. Agent Posey again started back to Tallapoosa when he saw still another one of the delivery trucks and followed it to the American Legion Hall in Tallapoosa. Around midnight on July 21, 1976, Posey observed one of the same trucks at the Union 76 station managed by Clarence Newborn, parked over the storage tanks with several unidentified males behind it. When the truck left, Posey tried to follow it but again lost it in Alabama. Agent Posey also saw these same trucks late at night at appellants Travis Williams' Shell and James George's independent station.
 
 
 12
 The FBI began intense and coordinated surveillance on the night of August 3-4, 1976, employing both federal and state agents in ground and air units. That night several of the delivery trucks were observed entering the Alabama site and leaving with what appeared to be heavy loads. One of the trucks was followed to the Tallapoosa residence of a defendant found guilty by the jury but who did not appeal. The next surveillance was on the night of August 11-12, when two heavily laden trucks were observed leaving the Alabama site one around one thirty a. m. and the other around five a. m. Both of the trucks were tracked by plane to James George's independent station in Tallapoosa, where the agents in ground units observed individuals standing by the trucks as they unloaded gasoline. On the following night, both heavily loaded trucks again were observed leaving the Alabama site. One left around midnight and was followed to Travis Williams' Shell station, where Alan Wayne Thompson was photographed delivering gasoline. The other truck left the tap site around five a. m. and was followed to Duel Bowling's Hess station in Carrollton, Georgia, where Wayne Thompson was photographed again, but no delivery was observed. The FBI observed other activities around the tap sites, on two more nights, and on August 31, 1976, the agents began making arrests, seizing much of the equipment used in the operation.
 
 
 13
 The balance of the evidence highlighted by the government as the basis of its case consists of: testimony concerning isolated incidents which the government contends further connected various defendants to the conspiracy, testimony from pipeline company officials that their lines had been tapped, gasoline delivery records from the various stations involved showing that all of the stations ordered less legitimate gas in the summer of 1976 than they had during the same period of 1975, telephone records of several co-conspirators indicating a series of calls between the parties during the operation of the conspiracy, and testimony from a FBI fingerprint expert that the fingerprints of many of the defendants were found on objects seized by FBI agents.
 
 
 14
 II. Sufficiency of the Evidence Underlying Count One Conspiracy.
 
 
 15
 We will first consider the plethora of challenges to the conspiracy convictions, sorting through the evidentiary labyrinth erected in the four week trial. All of the appellants were convicted under Count One, and all but five challenge the sufficiency of the evidence underlying their convictions. The five who do not claim that there was insufficient evidence for their conviction on this count were the conspirators who actually ran the operation the central core of Dorman Chandler and Sam Alta Dryden, and the working group of tappers and delivery personnel: Claude Wayne Cole, Dennis Chandler, and Alan Wayne Thompson.[2] The facts, as detailed in the previous section, make it clear that there was sufficient evidence to support the conspiracy convictions of these most active defendants.[3] It is also important to note that there is no question raised on appeal as to the admission of hearsay testimony.
 
 
 16
 With the evidence concerning the core of the conspiracy unchallenged, we turn now to the evidence against the defendants more peripherally involved the gas station owners and police officers. We are compelled, of course, to view the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); and we must make all reasonable inferences and credibility choices as will support the jury's verdict. United States v. Squella-Avendano, 478 F.2d 433, 435 (5th Cir. 1973). However, as to each of these appellants, the evidence respecting his participation in the conspiracy must of itself be sufficient so that the jury could have found beyond a reasonable doubt that each knew of the conspiracy, had the deliberate, knowing, and specific intent to join the conspiracy; United States v. Prince, 515 F.2d 564, 567 (5th Cir. 1975); and that some member of the conspiracy committed an overt act in furtherance of the illegal operation; United States v. Trevino, 556 F.2d 1265 (5th Cir. 1977). Due to the inherently secret nature of a successful conspiracy, this membership and requisite knowledge may be based upon reasonable inferences and circumstantial evidence, United States v. Becker,569 F.2d 951, 961 (1978); otherwise, conspirators might go free by their very ingenuity.
 
 
 17
 A. Gas Station Operators.
 
 
 18
 These appellants argue that even when viewed in the light most favorable to the prosecution, the only evidence linking them to the conspiracy was the testimony that several trucks suspected of delivering stolen gasoline were observed at their stations. They contend that for us to affirm their convictions on Count One we must find that delivery and delivery alone is sufficient to prove an agreement to steal or receive stolen gasoline. We disagree. Without deciding whether receipt and thus possession of recently stolen property is alone sufficient to infer knowing participation in the conspiracy, we find there was sufficient additional evidence so that the jury could have found beyond a reasonable doubt that each knew of the conspiracy, had the requisite intent to join the conspiracy, and that there were acts by various coconspirators in furtherance of the conspiracy.
 
 
 19
 1. James Richard George.
 
 
 20
 "Jimmy" George owned an independent station in Tallapoosa. He ordered less gasoline from his legitimate suppliers during the months of the conspiracy than he had during the same months of the previous year. Millard Mann, Tallapoosa police officers Williams and Robinson, Georgia Revenue Agent Vance Posey, and various FBI agents all observed late night, clandestine deliveries to his station by the various trucks involved in the conspiracy. Further, George was observed paying money to Alta Dryden for what the jury could have found was a debt incurred from purchasing stolen gasoline. This evidence was sufficient to sustain the jury's verdict against appellant George on Count One.2. Buran Robinson.
 
 
 21
 Buran Robinson owned a Standard Station in Tallapoosa. In addition to ordering less legitimate gas during the conspiracy and having surreptitious deliveries observed at his station by Mann and Officer Williams, the government introduced the testimony of one Agnes Brown, that on August 31, 1976, the day on which many of the arrests in this case were made, she was told by Robinson that he was afraid that he too would be arrested because he had been buying stolen gasoline along with many other Tallapoosa station owners. This very damaging admission, when read in conjunction with the other direct and circumstantial evidence, was sufficient for the jury to have found he knew of the conspiracy and infer that he had the required intent to join it.
 
 
 22
 3. Clarence Newborn.
 
 
 23
 Newborn did not own, but managed the Union 76 Station in Tallapoosa.[4] The evidence of his guilt is strong. Numerous covert deliveries to the 76 Station were observed by Mann, Agent Posey, and Officer Williams. During one of the deliveries observed by Officer Williams, gasoline was discovered spilling from the delivery truck out into the street. Newborn was called to clean up the spill and shortly after he arrived, Dorman Chandler the central figure in the conspiracy mysteriously appeared to converse with Newborn. Additionally, testimony was admitted without objection that Alta Dryden had told Mann that Newborn was delinquent in his payments for the stolen gas he had received. Appellant Newborn's guilt was clear, and we affirm his conviction.
 
 
 24
 4. Travis Williams.
 
 
 25
 Travis Williams owned a Shell Station in Tallapoosa. Williams ordered less legitimate gasoline during the conspiracy; had numerous clandestine deliveries observed by Mann, Williams, Robinson, Posey, and the FBI; and was observed paying Alta Dryden for gas he had received. This is sufficient evidence to sustain his conviction on Count One.
 
 
 26
 5. Curtis Morrow.
 
 
 27
 Morrow owned a Union 76 Station in Fruithurst, Alabama. He ordered less legitimate gas during the months of the conspiracy. While the evidence of actual delivery of stolen gas to his station was less specific Mann and Posey only saw delivery trucks parked at his station late at night the testimony of Jack Norton, the sheriff of the Alabama county in which a tap was located, that Morrow approached him in behalf of "some big men with big money" to pay him $500 down and $200 a month concerning a gas tap operation was sufficient for the jury to infer both knowledge of the conspiracy and intent to join and further its cause.
 
 
 28
 6. Duel Bowling.
 
 
 29
 Bowling owned a Hess Station in Carrollton, Georgia. His records show a considerable drop in legitimate gasoline orders during the months of the conspiracy, even though he had installed dual pumps, which gave him an increased capability to pump gas. Although no actual deliveries were observed at his station, an attempted delivery was seen and photographed by the FBI surveillance team. Moreover, testimony was introduced without objection that Mann once overheard Alta Dryden state that a load of gas was to be taken to Bowling's Hess Station. Finally, telephone records indicated a significant series of calls between Bowling's station and Alta Dryden's store during the months of the conspiracy. This evidence is sufficient to sustain the jury's verdict against appellant Bowling.7. Sammy Robinson.
 
 
 30
 The government's case against appellant Sammy Robinson was somewhat weaker than its case against the appellants discussed above. We conclude, nevertheless, that the evidence was sufficient to support the jury's finding of guilt on Count One. Sammy Robinson owned the Triangle Shell Station and store in Tallapoosa. He ordered less gas during the months of the conspiracy. Officer Williams saw one of the delivery trucks parked at the Triangle Station, and Officer Robinson observed one of the trucks manned by an unidentified male at the station with a hose extending from it, as if delivering gas. Both of these observations were between midnight and six a. m., when the stations were closed for normal business. We find that in view of the well-established overall conspiracy, the late night deliveries in custom rigged farm trucks, and the dramatic decrease in the amounts of gasoline ordered during the peak months of the conspiracy, the evidence was sufficient for the jury to infer the requisite knowledge and intent, and thus, we affirm the conviction.
 
 
 31
 B. Tallapoosa Police Officers.
 
 
 32
 Both Jimmy Doyle Folsom, the chief of police of Tallapoosa, and Robert Lee Rolsom, the assistant chief of police, attack their convictions on Count One on the grounds that the evidence was insufficient to support the jury's verdict. The government argues that the Folsoms performed an integral role in the conspiracy, engaging in activities to cover up and protect the illegal gasoline deliveries.
 
 
 33
 1. Jimmy Doyle Folsom.
 
 
 34
 The evidence against the chief of police is strong. When Officer Williams told Chief Folsom of the late night gasoline spill at the Union 76 Station operated by Clarence Newborn, the chief told Williams not to worry about it because "the state" was working on the case. In fact, at that time no state or federal agency was specifically aware of these illegal activities in Tallapoosa. Later, when Officer Williams was discussing the spill on the police radio, Chief Folsom told him that he should not talk about it because it would hurt the state's case. As a result of these admonitions, Officer Williams did not report the spill or any other information concerning these covert gasoline deliveries until he and his partner were approached by Georgia Revenue Agent Posey.
 
 
 35
 Chief Folsom was further implicated by Walker Abercrombie's testimony that the chief had offered to sell him and Andy Devine gasoline for $.25 a gallon. The appellant attempts to discredit this testimony, which, while proper for the jury's consideration, has no merit on appeal. We find that Officer Williams' testimony, when read in conjunction with that of Walker Abercrombie, clearly provided sufficient evidence for the jury to find that Chief Folsom was an active member of the conspiracy.
 
 
 36
 2. Robert Lee Folsom.
 
 
 37
 As to the assistant chief of police, the only evidence that could support his conviction on Count One was the testimony of two witnesses that he drove through or was present at service stations where deliveries of stolen gasoline were potentially taking place. Although Millard Mann testified that "Buddy" Folsom twice drove through stations while gas was being delivered, he stated that Folsom only circled through the front portion of the stations on what appeared to be on a normal patrol of the town and may not have seen the delivery of the stolen gas which was occurring toward the rear of the station. Further, Mann clearly stated that as far as he knew, Robert Folsom had no knowledge at all of the conspiracy. The only other evidence against the assistant chief was the testimony of George Haygood that on his way to work one morning in the late summer of 1976, he saw Buddy Folsom at Travis Williams' Shell Station, standing near one of the delivery trucks with several unidentified males. As Haygood drove past the station, the other individuals "ducked down" in what appeared to be an attempt to hide; whereas Folsom simply waved. At most, this evidence could raise a suspicion that Robert Folsom may have been aware that a crime was being committed. There is no evidence from which the jury could have found beyond a reasonable doubt that he was a knowing member of this conspiracy. Mere knowledge, approval, or acquiescence in the object or purpose of a conspiracy is insufficient to prove participation in it. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). Further, mere presence at the scene of a crime or mere association with the members of a conspiracy is not enough to sustain a conviction for conspiracy. United States v. James, 528 F.2d 999, 1013 (5th Cir. 1976). While Robert Folsom's presence at these events may raise some doubts about his role, we conclude as a matter of law that the evidentiary foundation relied upon by the government is too flimsy and insubstantial to support a guilty verdict of conspiracy to steal gasoline from interstate pipelines.
 
 
 38
 III. Count II Interstate Transportation.
 
 
 39
 All of the defendants were charged in Count Two of the indictment with aiding and abetting the interstate transportation of stolen gasoline in violation of 18 U.S.C. § 2314. Eight of the appellants were convicted on this count and challenge their convictions on various grounds.[5] The first paragraph of § 2314 makes it a federal offense to transport in interstate commerce stolen property with a value of $5,000 or more. This jurisdictional minimum has frequently been held to be an essential element of the offense. See, e. g. United States v. Nall, 437 F.2d 1177 (5th Cir. 1971).
 
 
 40
 After a careful review of the record, we find that there was a failure of proof as to this essential element, and for this reason, we reverse all convictions on Count Two. Even viewing the evidence in the light most favorable to the government, and making all reasonable inferences that would support the verdict, the evidence of actual state line crossings sufficient to satisfy the $5,000 limitation was at best speculative. Without reaching the confusing and conflicting computational battle fought by the parties, we find that since the government's proof was so speculative as to the quantity of gasoline carried by the various delivery trucks on the interstate trips used to calculate the jurisdictional minimum, the convictions on Count Two must fail.
 
 
 41
 The government's case on this count was founded on the tenuous assumption that each truck was filled to capacity on every interstate trip used to calculate the jurisdictional limit. Without such assumption, the evidence of state line crossings actually observed falls short of the jurisdictional limit. The only basis of the assumption was the testimony of FBI agents that the trucks appeared to be straining under a heavy load as they were observed leaving the tap site. This is simply not enough to make the essential inference that the trucks were filled to their capacity.[6]
 
 
 42
 This very speculative assumption, necessary to bring the government's most favorable computations within the jurisdictional minimum, is too tenuous to support the convictions on Count Two. Although we are quite sure that the $5,000 limitation was not designed to protect those who transport property of a lesser value but rather to avoid overtaxing the federal judicial system, its effect is to leave the punishment of such persons to the states and to make the limitation an essential part of the federal crime.[7]
 
 
 43
 IV. The Prosecutor's Comment.
 
 
 44
 Appellant Claude Wayne Cole objected at trial to certain statements made by the Assistant United States Attorney during his closing argument, and on appeal he argues that those remarks and the trial court's failure to adequately correct their influence constitute reversible error as a comment on his failure to testify.
 
 
 45
 The prosecutor made the following statement toward the end of his closing argument:
 
 
 46
 There is just too much, ladies and gentlemen, I don't have the time to cover it all. Some of the physical evidence that we have, Wayne Cole, I asked him to explain where his fingerprints were on the white truck that were (sic) found at his house. The fingerprints at the Villa Rica tap site.
 
 
 47
 The appellant's counsel immediately objected, the jury was sent out of the courtroom, and appellant's counsel moved for a mistrial. The following colloquy then took place:
 
 
 48
 MR. FROELICH (Assistant United States Attorney): I didn't say Mr. Cole, I said I meant to say his attorney or Mr. Kirwan.
 
 
 49
 I apologize and I will correct the remand (sic) to the jury. I said him. I didn't say Mr. Cole. I meant Mr. Kirwan.
 
 
 50
 THE COURT: You said Mr. Cole.
 
 
 51
 MR. FROELICH: No, I did not say Mr. Cole, Your Honor.
 
 
 52
 After this exchange, the court had the record read back, denied the motion for mistrial, admonished the prosecutor, and then called the jury back into the courtroom, giving the following instruction:
 
 
 53
 THE COURT: Ladies and gentlemen of the jury, I instruct you that you should disregard the last statement made by the District Attorney with respect to the defendant, Claude Wayne Cole.
 
 
 54
 The law does not require that a defendant prove anything but the burden is always on the prosecution as I will instruct you in my final charge to prove beyond a reasonable doubt every essential element of the crime charged.
 
 
 55
 And the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.
 
 
 56
 Finally, in his general charge at the close of the trial, the judge stated:
 
 
 57
 The law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn, from the failure of a defendant to testify.
 
 
 58
 It is well settled that under both the Fifth Amendment to the United States Constitution and 18 U.S.C. § 3481, it is not permissible for the prosecution to comment on a defendant's failure to testify. Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961); Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650 (1893); Samuels v. United States, 398 F.2d 964, 968 (5th Cir. 1968), Cert. denied, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969). Such a comment is equally forbidden even though it is indirect. Benham v. United States, 215 F.2d 472 (5th Cir. 1954). In United States v. Rochan, 563 F.2d 1246 (5th Cir. 1977), this court recently restated the test for reversing a conviction on the grounds of improper comment by the prosecutor. The court stated:
 
 
 59
 To reverse for improper comment by the prosecutor, we must find one of two things: that 'the prosecutor's manifest intention was to comment upon the accused's failure to testify' or that the remark was 'of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'
 
 
 60
 Id. at 1249 (citations omitted).
 
 
 61
 A. Manifest Intention to Comment.
 
 
 62
 In Rochan, the court stated our policy not to find that the prosecutor manifestly intended to comment on the defendant's failure to testify if some other explanation is equally plausible. Faced with a remark quite similar to the one here, the court in Samuels v. United States, 398 F.2d 964, 968 (5th Cir. 1968), declined to reverse because it was found to be "very possible" that the prosecutor's statement was "merely inadvertent" and that his intent was to use the defense counsel's name rather than that of the defendant. See also United States v. Wilson, 500 F.2d 715, 721 (5th Cir. 1974). In United States v. Ward, 552 F.2d 1080, 1083 (5th Cir. 1977), the court concluded that the prosecutor's remarks did not require reversal when they were "more likely" intended for a proper purpose to refer to the defendants' failure to produce "evidence of any kind . . . to rebut the inference of knowledge that naturally follows from the possession of recently stolen property" than to comment on the defendant's failure to take the stand.
 
 
 63
 In the instant case, the prosecutor's statement does not make logical sense as transcribed. The prosecutor could not have "Asked " Wayne Cole anything because Cole did not take the stand. Further, if we assume that the court reporter quite reasonably transcribed "ask" as "asked," the statement still lacks meaning since it was made during the prosecutor's closing argument, when the government could no longer ask questions to any witnesses. Thus, the only reasonable interpretation of the remark is to find that the prosecutor inadvertently used the defendant's name when he intended to call on the defendant's counsel to explain in his closing argument this uncontradicted evidence. This was, in fact, the explanation given by the prosecutor immediately after the remark was made. This appropriate motivation seems at least as likely as a manifest intention to comment.
 
 
 64
 B. Effect on the Jury.
 
 
 65
 We further find that the appellant has not shown that the jury necessarily construed the remark as a comment on his failure to testify. A review of this court's cases involving this issue reveals our reluctance to find the necessary improper understanding on the part of the jury. In United States v. Toler, 440 F.2d 1242 (5th Cir. 1971), we considered a government attorney's statement in a prosecution for filing a false medical claim for Social Security benefits. The prosecutor said "at no time has he (the defendant) denied filing it," and we found it not a comment on the defendant's failure to take the stand, but rather on the uncontradicted state of the evidence. Again in Samuels v. United States, 398 F.2d 964 (5th Cir. 1968), we found that the jury did not necessarily construe improperly the remark "G.L. Samuels does not want to talk about the facts," stating that it was "very possible" that the prosecutor's inadvertent use of the defendant's name instead of the defense counsel's name could have been interpreted by the jury as directed to the argument of counsel and not to the defendant's failure to testify. In United States v. Rochan, 563 F.2d 1246 (5th Cir. 1977), we found that the prosecutor's rhetorical question posed midway through his closing argument "what did we hear from the defense in this case?" was not necessarily interpreted by the jury as a comment on the defendant's failure to testify, but could have been understood as a transitional device.[8]
 
 
 66
 In this case, we feel that the jury could have quite reasonably construed the prosecutor's remark as we have that is, as an inadvertent reference to the defendant when he intended to call on the defense counsel to explain in his closing argument the uncontradicted evidence concerning the presence of defendant Cole's fingerprints on objects seized by the FBI in connection with the arrests in this case. At the very least, it can be said that this contested statement, when read in context, represents a borderline case as to whether there was a comment on the defendant's failure to testify. As such, we feel that any potential impropriety of the prosecutorial comment was cured by the court's instructions both immediately after the remark was made and at the close of the trial. Although it is clear that in extreme cases it would be unrealistic to assume that instructions can remove the prejudicial effects of a constitutional error, we do not feel the mistake here was impossible of correction. The comment under attack was unexceptional, lacking in aggravation and emphasis. Further, we find that the evidence of appellant Cole's involvement in the conspiracy as an active participant was great. We thus hold that the prosecutor's comments were not of such a nature as to constitute reversible error.
 
 
 67
 V. The Supplement Charge.
 
 
 68
 At the close of this four week trial, the jury was given a comprehensive general charge. After deliberating approximately one day, the foreman requested a clarification on the relationship between Counts One and Two. The trial court gave a supplemental charge in which it attempted to clarify this relationship; however, the court misstated the law when it charged "if there is no violations (sic) of any substantive count, then, of course, there couldn't be any violation of Count One, which is conspiracy, because the conspiracy depends upon there being a violation of a Federal law. . . ." Immediately upon the jury's returning to continue with its deliberations, counsel for the government objected to the erroneous portions of the supplemental charge. Realizing the error, the court recalled the jury and gave the following exchange:
 
 
 69
 THE COURT: Ladies and gentlemen of the jury, it has been called to my attention that I may have misstated the law with respect to conspiracy as it relates to the other counts of the indictment, and I want to be sure that I am correct in what I tell you in that regard.
 
 
 70
 As I charged you earlier, of course, a conspiracy is an unlawful agreement between two or more persons to violate a law of the United States, and of course, if an agreement is made to violate the law and a defendant in the case becomes a member of that conspiracy or becomes a part of that agreement, then of course, that would be a conspiracy, that is a violation of the law. It may not be that the violation may not eventually be successful.
 
 
 71
 I think I charged you that yesterday. The venture may not be successful at all. They may get caught before it is ever carried out. But still, if there is an agreement to violate the laws of the United States and a defendant participated in that agreement then he becomes a member of the conspiracy. I think that generally states the law as I charged it to you yesterday.
 
 
 72
 If you want a re-charge on any portion of that, I will be glad to do it, but I will again give you the definition that I gave you in the charge yesterday, that, If two or more persons conspired to commit an offense against the United States, and one or more of such persons do any act to effect the object of the conspiracy, each is guilty of an offense against the laws of the United States. And simply, a conspiracy is a combination of two or more persons by concerted action to accomplish some unlawful purpose or to accomplish some lawful purpose by unlawful means. So a conspiracy is a kind of partnership in criminal purposes in which each member becomes the agent of every other member.
 
 
 73
 The gist of the offense is a combination or agreement to disobey or disregard the law and that is the definition of a conspiracy.
 
 
 74
 (Emphasis added.)
 
 
 75
 Defense counsel objected to this second supplemental charge on the grounds that it emphasized the law more favorable to the prosecution, arguing specifically that the final charge neglected to give the overt act requirement for a conspiracy conviction. They requested a third supplemental charge to stress this point, but the trial court denied it, stating "if I followed what you want me to do, I would have to give the entire charge all over again, and I don't think that is required."
 
 
 76
 The only contention challenging the supplemental charges that requires consideration is the appellants' attack on the failure of the court to adequately give the overt act requirement in the second supplemental charge. Concentrating their attack on the fifth and sixth paragraphs, the appellants argue that this instruction left the jury with the impression that a conspiracy conviction is permissible on finding an illegal agreement alone, without proof of an overt act. We disagree. As previously stated, this final charge was given in response to the government's objection that the first supplemental charge was incorrect in stating that a defendant could not be found guilty on the conspiracy count if there were no violations as to substantive counts. Consequently, the court stated several times that the essence of a conspiracy is the agreement, and that even if the venture is unsuccessful, a defendant may still be found guilty of conspiracy. Yet while the court stressed these instructions in an attempt to cure its misstatement, it did not overlook the overt act requirement. This is clearly given in the first paragraph of the second supplemental charge, as well as having been set out in the general charge to the jury given the previous day.
 
 
 77
 In examining a challenge to the court's charge, we do not segment it and pass upon isolated statements out of context. January v. United States, 409 F.2d 31 (5th Cir. 1969). We must look at the entire charge and assess its meaning as a whole in order to determine if the issues were fairly presented to the jury. Beck v. United States, 317 F.2d 865 (5th Cir. 1963), Cert. denied, 375 U.S. 472, 84 S.Ct. 480, 11 L.Ed.2d 419 (1964). After a thorough review of all the court's charges here, we find that the instructions fairly presented the issue of conspiracy and the relationship of a conspiracy to the substantive counts. From the manner and types of verdicts returned, it is apparent that the jury understood the charge and how to apply it to all of the counts of the indictment. The rights of the appellants were certainly not so adversely affected as to constitute a manifest miscarriage of justice. United States v. Rojas, 502 F.2d 1042 (5th Cir. 1974); United States v. Resnick, 488 F.2d 1165 (5th Cir.), Cert. denied, 416 U.S. 991, 94 S.Ct. 2400, 40 L.Ed.2d 769 (1974). Thus, we find no reversible error.
 
 
 78
 VI. Conclusion.
 
 
 79
 All convictions on Count One are AFFIRMED, except for that of Robert Lee Folsom, which is REVERSED for the reasons stated in Section II of this opinion; all convictions on Count Two are REVERSED for the reasons stated in Section III of this opinion; all other convictions are AFFIRMED.[9]
 
 
 80
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 [1]
 In an effort to minimize confusion due to the large number of names in this multiparty appeal, we will hereinafter refer to individuals who are not before the court in this appeal as "others." Dryden's name is used interchangeably in this opinion as Sam Alta Dryden and Alta Dryden, as it was at the trial
 
 
 [2]
 Appellant Alan Wayne Thompson may be challenging the sufficiency of the evidence to support his conviction on Count One by raising the issue that "the court erred in refusing to grant a motion for a new trial on the general grounds that the jury verdict was contrary to the weight of the evidence." In light of the direct and circumstantial evidence against him, this argument borders on the frivolous
 
 
 [3]
 Although these five appellants do not challenge the sufficiency of the evidence on Count One, they do attack the conspiracy conviction on the grounds that the trial judge committed plain error in failing to charge that knowledge of interstate transportation is a necessary element to convict on conspiracy to violate either 18 U.S.C. § 659 or § 2314. The appellants have seized on the discredited rule of the Second Circuit that scienter of a factual element that confers federal jurisdiction, while perhaps unnecessary to establish criminal liability on the substantive counts, is required in order to sustain a conviction for conspiracy to commit the substantive offense. See United States v. Crimmins, 123 F.2d 271 (2d Cir. 1941) and its progeny, E. g. United States v. Alsonda, 486 F.2d 1339 (2d Cir. 1973). We feel this argument is fully answered by United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975)
 
 
 [4]
 Newborn argues that because he was only the manager of the station and since no evidence of the scope of his duties as manager was presented, then under the principles of master and servant, any benefit, and, therefore, criminal liability must inure to the owner of the station and not Newborn. We find this argument devoid of merit. As the appellant admits in his brief, benefit cannot be equated with criminal conduct. The conviction here is for conspiracy to receive stolen gasoline the ultimate recipient of any benefit derived from the conspiracy is not controlling
 
 
 [5]
 Appellants Dennis Chandler, Dorman Chandler, Sam Alta Dryden, Jimmy Doyle Folsom, James Richard George, Clarence Newborn, Buran Robinson, and Alan Wayne Thompson
 
 
 [6]
 Assuming that a gallon of gasoline weighs 6.7 pounds, National Bureau of Standards, it seems quite possible that these farm trucks with 1000 and 2000 gallon tanks welded onto them could have been straining if only half filled
 
 
 [7]
 Since we reverse the Count Two convictions on this threshold jurisdictional issue, we do not reach the various other challenges
 
 
 [8]
 See United States v. Bates, 512 F.2d 56 (5th Cir. 1975), as an example of a prosecutorial remark necessarily having the forbidden effect on the jury. The prosecution stated in its rebuttal, "you didn't hear from the culprit"; a statement we found "couched in language so explicit that it could hardly escape the test as one 'of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' "
 
 
 [9]
 The court has given consideration to the other arguments raised by the appellants. We conclude that some of the issues raised in the many briefs submitted in the case do not merit separate discussion