UNITED STATES of America,
Plaintiff-Appellee,

v.

Dante Angelo GRASSI and Jack Louis
Gail, Defendants-Appellants.

No. 79–5415.

United States Court of Appeals,
Fifth Circuit.

May 14, 1980.

Arthur H. Zimmerman, Chicago, Ill., for Gail.

Jacob Kossman, Philadelphia, Pa., for Grassi.

Jody M. Litchford, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before MORGAN, ANDERSON and RANDALL, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

Dante Angelo Grassi and Jack Louis Gail appeal from convictions based on their participation in a series of transactions involving controlled substances and unregistered guns. The principal issues presented by this appeal concern the sufficiency of the evidence to prove a conspiracy and the fairness of the joinder of the appellants together with six other defendants in a 21-count indictment.

The indictment charged both Grassi and Gail with conspiring to distribute controlled substances and to possess, transfer and transport unregistered firearms in violation of 18 U.S.C. § 371 (count 1). Grassi was also charged with conspiring to import controlled substances in violation of 21 U.S.C. § 963 (count 2). Gail was charged with shipping firearms in interstate commerce in violation of 18 U.S.C. § 924(b) (count 17). The appellants were convicted as charged.[1]

The evidence against the defendants consists primarily of the testimony of undercover agents and of tape recordings of the agents' conversations with the defendants during the period covered by the indictment. Having assumed the identity of smugglers of firearms and narcotics, agents Ralph Altman and Gary Peacock of the Bureau of Alcohol, Tobacco and Firearms first met with defendant Charles Watson on April 27, 1978 at Watson's place of business in Homestead, Florida. The agents explained that they had a substantial business exchanging guns for drugs with South American sources, and were exploring for new contacts who would help in the landing, off-loading and distribution of a great quantity of marijuana that would be received in the near future. The agents added that they would also be interested in obtaining weapons and pistol silencers for use in their narcotics trade. Watson asked to join in the marijuana venture, and offered to find silencers for two pistols the agents were carrying. Altman and Peacock agreed to accept Watson's help and deliv-

---

1. Defendants Frank Ammirato, Carl Watson, Ken Lytle, Sturgall Russell and Charles Watson pleaded guilty in the early stages of the trial. Defendant Alfred Beuf, who requested a bench trial, was tried together with the appellants and was acquitted by the court.

ered two .22 caliber pistol barrels to be fitted with silencers.

Watson later introduced the agents to his brother, defendant Carl Watson, and defendant Frank Ammirato, who, Watson explained, could supply the agents with large quantities of automatic weapons, silencers and drugs. The agents met with the Watsons and Ammirato on May 5, 1978 at the construction site of the Ramblewood Middle School in Coral Springs, Florida. Carl Watson and Ammirato gave the agents a sample of pills from a supply of amphetamines they offered to sell. Four days later the agents met with Carl Watson again and purchased 1000 amphetamines for $850. At that meeting, the agents and Carl Watson discussed the details of the pending marijuana importation, Watson's progress in finding supplies of machine guns and pistol silencers, and the possibility that Watson and his associates would offer the agents a supply of quaalude pills.

Appellant Grassi was not introduced to the agents until May 12, 1978 during another meeting at the Ramblewood School. Grassi expressed interest in the agents' marijuana importation scheme, and proposed to work with the agents if they could supply reliable personal references. Peacock gave Grassi two names of people who would vouch for their operation, and Grassi proceeded to conduct a background check.

In the weeks that followed, Ammirato and Watson met regularly with Peacock and Altman to discuss the marijuana importation venture, and to negotiate and consummate various drug and firearms sales. Other defendants were introduced and participated in these deals, but neither Grassi nor Gail were present at any meetings during this stage of the investigations.[2]

Gail was not introduced to the agents until early July 1978. At a meeting on July 6 between the agents, Ammirato and Watson, Ammirato informed the agents that he had a contact in Chicago who could supply the agents with silencers. The next evening, Ammirato, Peacock and Altman travelled to Chicago to meet Gail—Ammirato's Chicago contact. Gail sold the agents one silencer and offered to begin supplying fifty more per month. During the same meeting, Ammirato explained the various pending drug deals to Gail, and in Gail's presence told the agents that Gail would be interested in purchasing some of the quaaludes the agents were to receive from Ammirato. Gail added that he was also interested in buying cocaine.

Complications soon developed in Gail's plan to provide silencers to the agents. Gail reported that his source for silencers insisted on fitting the silencers on complete pistols so that the silencers could be tested as they were made and fitted. When the agents explained this problem to Ammirato, Ammirato said that he could procure and ship pistols to Chicago as needed.

On July 26, at a meeting at the Ramblewood School, Ammirato showed Peacock and Altman two pistols he had purchased for them. Ammirato explained that he would have one of his men carry the guns to Chicago and deliver them to Gail to be fitted with silencers. Under the observation of agents of the Bureau of Alcohol, Tobacco and Firearms, defendant Alfred Beuf flew to Chicago that day, handed a briefcase to Gail at the airport, and left on

2. On May 22, Altman and Peacock met with the Watson brothers to discuss their agreement to buy quaalude pills. The two pistol barrels that Charles Watson had received from the agents were returned because Watson's source for silencers was not interested in the job.

At a meeting on May 23 between the agents, Ammirato and Carl Watson, Ammirato stated that he could provide pistols and silencers at $1000 apiece, and accepted a .22 caliber pistol barrel from the agents to try to have it silenced. Watson and Ammirato assured the agents that Grassi's background check was going well.

On May 30, Carl Watson sold a machine gun to the agents for $750. Subsequently, Watson and Ammirato sold another machine gun to the agents for $500 and promised to provide a large supply of silencers.

On July 10, Ammirato and Ken Lytle sold the agents 24 ounces of PCP for $20,700. On July 26, Ammirato introduced the agents to Sturgall Russell, who offered to sell 800 firearms for $250,000, and later delivered two .30 caliber rifles. On August 14, the agents purchased a .22 caliber pistol from Carl Watson.

a departing flight. Informed by Ammirato that the pistols were ready, Peacock and Altman flew to Chicago two days later and purchased . the two silenced pistols from Gail.

Grassi reentered the scene on July 27 when the agents met with Ammirato and Grassi at Ammirato's home. The discussion at this meeting covered the planned marijuana importation as well as the many other completed and proposed illicit transactions. Ammirato told the agents that they would not receive any more pistols or silencers until the marijuana importation was accomplished. Grassi then proposed that if the agents could provide their own planes for the marijuana importation, he would send one of his men to protect them and arrange for a purchase of fifteen to thirty kilograms of cocaine along the way. The conversation then turned to the other illicit deals, and although Grassi listened, it does not appear that he contributed to this discussion or took part in any negotiation.

Further discussions and transactions between the agents and certain defendants followed.[3] The agents' last conversation with Gail before his arrest was at a meeting in Chicago on September 19. Gail stated that he was still interested in obtaining quaaludes, possibly in exchange for pistols and silencers, and asked when the agents thought they would receive their quaaludes from Ammirato.

The eight defendants were arrested in late November of 1978 and joined in a 21-count indictment alleging two conspiracies and nineteen substantive offenses. Only Grassi and Gail resisted their convictions to the conclusion of the jury trial.[4]

## I SUFFICIENCY OF THE EVIDENCE

 Following the selection of the jury but prior to the examination of the first

witness before the jury, the district court held a hearing to determine the admissibility of certain extrajudicial declarations that the prosecution intended to introduce under the coconspirator rule. Such a hearing is mandated by *United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The purpose of the *James* hearing is to establish the existence, or nonexistence, of the predicates for the admission of a coconspirator's extrajudicial declaration *before* the declaration is made known to the jury. To be admissible, the extrajudicial statement must have been made (1) by one who conspired with the party against whom the statement is offered, (2) during the course of the conspiracy, and (3) in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). Under *James*, the responsibility for making these findings rests exclusively with the judge. 590 F.2d at 579–80.

 Evidence submitted at a *James* hearing for the purpose of proving a conspiracy must, of course, be free from hearsay objection; otherwise, a coconspirator's hearsay might bootstrap itself into admissible evidence. Moreover, in order to protect the defendant from the admission of prejudicial hearsay on the basis of threadbare evidence of conspiracy, the judge must decide at the conclusion of the *James* hearing whether the independent evidence linking the defendant to the conspiracy is substantial. 590 F.2d at 580–81. If a coconspirator's extrajudicial declaration is admitted into evidence, the judge must reconsider its admissibility at the conclusion of the trial. His second decision, however, is to be made by a higher standard: whether the prosecution, through independent evidence, has demonstrated the defendant's participation in a conspiracy by a preponderance of the evidence. If the prosecution has not pre-

---

**3.** On July 27, the agents met with Watson and Ammirato to discuss various proposed firearm and drug deals.

On August 2, agent Altman placed $250,000 in a safe deposit box as payment for 800 firearms from Russell, but a dispute developed over the method of delivery and the transaction was aborted.

The agents were unable to provide local references to the satisfaction of Grassi and Ammirato, and the marijuana transaction was never completed.

**4.** *See* note 1 *supra*.

vailed on this point, the judge must decide whether a cautionary instruction will cleanse the record of prejudice or whether a mistrial is required. 590 F.2d at 582–83.

Appellants Grassi and Gail contend that the district court failed to apply the standards for proof of conspiracy enunciated in *James*, and that as a result, inadmissible hearsay was injected into the trial. The appellants further contend that the record as a whole is insufficient to sustain their conspiracy convictions.

■ At the outset of the *James* hearing the court urged the prosecution to move quickly and to present no more than the "threshold basis" for the invocation of the coconspirator rule. Had the prosecution attained the threshold as to every defendant and every conspiracy, we would have no quarrel with the district court's sustained efforts to expedite the proceedings. While the preliminary requirement of substantial evidence is not very rigorous, it demands at the very least that the court should determine that there is enough merit in the prosecution's case to risk the admission of hearsay that might later prove inadmissible when the court makes its second, more scrutinizing analysis of the evidence.

As to Grassi's link with the count 1 conspiracy, the *James* hearing record is nearly void. Agent Altman testified that on July 27 Grassi met with the undercover agents and Ammirato at Ammirato's home, and that Grassi discussed his role in the planned importation of marijuana (count 2 conspiracy). The *James* hearing record shows no discussion of the count 1 conspiracy at this meeting except for Ammirato's introduction of defendant Beuf to the agents as "the kid who took the two pistols to Chicago for you." Nowhere does the record show that Grassi had joined the count 1 conspiracy, although it is clear that he was familiar with the conspirators and knew of their activities. The district court ruled that the prosecution had submitted substantial independent evidence against Grassi on count 1; consequently, government witnesses were allowed to testify that Ammirato had described Grassi as part of Ammirato's group.

■ If the evidence later produced at trial had supplied the needed link between Grassi and the count 1 conspiracy, we would hold that any error at the *James* hearing was not prejudicial. The trial record, however, adds very little as to Grassi's connection with the count 1 conspiracy. The agents again testified that Grassi was present at the July 27 meeting and that he discussed the terms of his involvement in the plan to import marijuana. It also appears that the others present at the meeting talked of other illicit transactions comprising the count 1 conspiracy, and that Grassi listened to these conversations.

Nevertheless, there is no evidence that Grassi was a participant in the count 1 conspiracy discussions, or that he indicated, expressly or impliedly, his involvement or personal interest in the count 1 conspiracy. Rather, the record shows that Grassi attended the July 27 meeting only to protect his interests in the marijuana importation scheme.

■ It is a cardinal rule of conspiracy law that one does not become a coconspirator simply by virtue of knowledge of a conspiracy and association with conspirators. *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed.2d 128 (1940); *United States v. Barrera*, 547 F.2d 1250 (5th Cir. 1977); *United States v. Chandler*, 586 F.2d 593 (5th Cir. 1978). The essence of conspiracy is the agreement to engage in concerted unlawful activity. To connect the defendant to a conspiracy, the prosecution must demonstrate that the defendant agreed with others to join the conspiracy and participate in the achievement of the illegal objective. *United States v. Avila-Dominguez*, 610 F.2d 1266 (5th Cir. 1980).

■ Conspiracy law is not a dragnet for apprehending those with criminal dispositions. To prove that Grassi was aware of the illegal plan charged in count 1, and even approved of it, may impugn his character but does not place him in violation of the conspiracy laws. While evidence of knowledge and association may be combined with other circumstantial evidence to prove an

agreement to join a conspiracy, *United States v. Etley*, 574 F.2d 850 (5th Cir. 1978); *United States v. Evans*, 572 F.2d 455 (5th Cir. 1978), we are unable to find any additional independent evidence against Grassi to support his count 1 conviction.

■■■ Since the independent evidence against Grassi is not substantial, we give no weight to the hearsay evidence that Grassi worked for Ammirato, and it follows that the prosecution's evidence against Grassi under count 1 was fatally deficient. *United States v. Malatesta*, 590 F.2d 1379 (5th Cir. 1979).

■■■ As for Grassi's conviction under count 2, charging him with conspiracy to import marijuana, we find a sound basis in evidence. Grassi does not deny that he was a full participant in the planning of the marijuana importation, but he argues that discussions of the scheme were only preliminary to, and did not result in, a final criminal agreement. It is true that the importation was to occur only if Ammirato and Grassi became satisfied that they were not dealing with police, but such a proviso is like any condition in an agreement. That the agreement was subject to a condition does not make it any less an agreement.

At the time of his arrest, Grassi had agreed in principle to the undertaking, and together with Ammirato he had begun to negotiate the details of the plan and to discuss the necessary preparations. From this, the jury could find that Grassi had conspired to import marijuana. *United States v. Thomas*, 567 F.2d 638 (5th Cir.), *cert. denied*, 439 U.S. 822, 99 S.Ct. 90, 58 L.Ed.2d 114 (1978).

Like Grassi, appellant Gail contests the sufficiency of the evidence underlying his count 1 conspiracy conviction. As to Gail, however, there is no shortage of evidence of participation in at least some aspects of the wide-ranging criminal enterprise described in count 1. Gail's principal contention is that the many transactions proven during the trial were in reality separate conspiracies, most of which had nothing to do with Gail, and that the prosecution failed to es-tablish the single, all-encompassing conspiracy alleged in the indictment.

■■■ This asserted variance between the indictment and the evidence is ground for reversal only if it affected a substantial right of the defendant. Proof of separate conspiracies after an indictment charging one conspiracy is not, *per se*, prejudicial. *Robinson v. United States*, 333 F.2d 950 (5th Cir.), *cert. denied*, 379 U.S. 921, 85 S.Ct. 277, 13 L.Ed.2d 335 (1964). Gail contends that he was prejudiced before the jury by his joinder in a single trial with numerous unrelated defendants and criminal evidence based on an imaginary grand conspiracy. We therefore consider the question of variance of proof together with the question of whether joinder was permissible.

## II JOINDER

The propriety of the joinder of two or more defendants in a single indictment is governed by Rule 8(b) of the Federal Rules of Criminal Procedure, which provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts of transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

■■■ Whether joinder is sound under Rule 8(b) is to be determined from the face of the indictment. If the indictment's allegations, taken as true, establish a single conspiracy, there can be no inherent prejudice to the defendants. *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977). Severance of the defendants is then a matter of trial court discretion under Rule 14 of the Federal Rules of Criminal Procedure. A trial court's denial of a motion for severance will not be reversed unless that discretion has been abused. *United States v. McLaurin*, 557 F.2d 1064 (5th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978).

The appellants' arguments against their joinder take two courses. First, they contend that the indictment and the evidence show that the count 1 conspiracy is in fact a multiplicity of conspiracies. Because we reverse the count 1 conviction against Grassi, this argument is now of importance only to Gail's appeal.

 It is not crucial to the existence of a conspiracy that each conspirator participate in every phase of the criminal venture. *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Nor is it necessary for each conspirator to have knowledge of the identity and role of each of his coconspirators. *Id.* The unity essential to a conspiracy is derived from the assent of its members to contribute to a common enterprise. Seemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership. *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974).

 The evidence, viewed in the light most favorable to the prosecution, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1947), showed that the government agents had introduced themselves to the defendants as large-scale narcotics and firearms dealers in need of guns and willing to purchase additional quantities of drugs. Over several months, they established a regular business relationship with Ammirato and the Watsons, through whom appellant Gail and other defendants were introduced. Ammirato and the Watsons assisted Gail and the agents in the development of a new channel for guns and silencers. Gail in turn acquired an expectation that he would receive a share of the narcotics exchange between the agents and Ammirato. Each of the defendants involved in the count 1 conspiracy showed an interest in and awareness of the full range of activities encompassed in the count 1 conspiracy. Though Gail may not have

known the identity of each defendant implicated in the illicit business, he was cognizant that there were others acting in unison to provide guns and drugs for the agents and he understood that his services were needed to satisfy Ammirato's new business associates. At the hub of this "wheel" conspiracy [5] was Ammirato, a common denominator to nearly every phase of the conspiracy. Neither the indictment as drafted nor the evidence produced at trial negate the prosecution's theory of a single count 1 conspiracy.

 The appellants' second argument against their joinder is that it was improper to combine separate conspiracies having different memberships. Rule 8(b) permits joinder of defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." On its face, the indictment makes allegations sufficient to meet this test. All named defendants were charged with the count 1 conspiracy. The addition of count 2, which did not charge Gail, rested on the theory, supported by the allegations, that the two conspiracies were part of the same series of acts or transactions. The count 1 conspiracy sprang from the count 2 conspiracy, and served partly to develop the organization needed to accomplish the count 2 conspiracy. Both conspiracies were alleged to have been formed during the same meetings by the same central participants, and were proved by much the same evidence. *See United States v. Gentile*, 495 F.2d 626 (5th Cir. 1974). While our decision on this appeal that count 1 should have been dismissed as to Grassi attenuates the relationship between the defendants, it does not compel the conclusion that joinder was erroneous or prejudicial. Separate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions. *United States v. McDaniel*, 538 F.2d 408 (D.C. Cir. 1976).

---

**5.** *See Kotteakos v. United States*, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557, 1561 (1946); *United States v. Levine*, 546 F.2d 658 (5th Cir. 1977).

Since joinder was permissible under Rule 8(b), severance was in order only if undue prejudice was likely to result from a joint trial. Having considered the record carefully, we cannot say that the district court abused its discretion in denying the motion for severance.

## III ENTRAPMENT

 Gail also argues on appeal that the prosecution failed to rebut his defense of entrapment. Once the defendant submits some evidence that he was induced to commit the crime, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. *United States v. Hammond*, 598 F.2d 1008 (5th Cir. 1979).

The evidence showed that the agents were led to Gail by Ammirato, and that Gail sold the agents a weapon during their first meeting. Thereafter, Gail continued to do business with the agents with little encouragement and even proposed further illicit transactions. There is simply no merit to the contention that Gail was entrapped.

## IV GRASSI'S SPECIAL PAROLE TERM

When Grassi appeared before the court for sentencing, the district judge imposed prison terms of five years on count 1 and ten years on count 2, to be served consecutively. One day later, the district judge determined that federal law required the imposition of a three year special parole term in addition to Grassi's count 2 prison sentence. The special parole term was added to Grassi's sentence by a written order of the district court.

The punishment for Grassi's count 2 conviction is prescribed by 21 U.S.C. § 963, which provides the same range of sentences for conspiracy as would apply for the underlying offense. The punishment for the importation of marijuana, the object of the count 2 conspiracy, includes a mandatory three year special parole term. 21 U.S.C. § 960. This circuit has held that the special parole term "may" be imposed on offenders convicted under section 963. *United States v. Foundas*, 610 F.2d 298 (5th Cir. 1980). We can see no reason why the special parole term of section 963 should not be mandatory for conspirators if the section applies at all. We remand for resentencing, however, because the defendant was not present when his sentence was extended. *See Caille v. United States*, 487 F.2d 614 (5th Cir. 1973).

AFFIRMED in part, REVERSED in part, and REMANDED.