UNITED STATES of America,
Plaintiff-Appellee,

v.

Neil ROE, a/k/a Nick Shelby and Ray
Tietjen, Defendants-Appellants.

No. 80–5282.

United States Court of Appeals,
Eleventh Circuit.

March 15, 1982.

James D. Whittemore, Robert W. Knight, Fed. Public Defender, Tampa, Fla., for Tietjen.

Harley Edward Riedel, II, Stichter & Riedel, Tampa, Fla., for Roe.

Judy S. Rice, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before FAY, ANDERSON and CLARK, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

In this direct criminal appeal, defendants-appellants Neil Roe, a/k/a Nick Shelby, and Ray Tietjen each were convicted of one count of conspiracy to defraud, two counts of wire fraud, and two counts of inducing a person to travel in interstate commerce in the execution of a fraudulent scheme, in violation of 18 U.S.C. §§ 2, 371, 1343, and 2314. The district court sentenced each defendant to five years on each of the five counts, with the sentences to run concurrently. We affirm.

## I. FACTS

The defendants were officers and shareholders of Deltron Industries, Inc. ("Deltron"), located in Tampa, Florida. Through a franchising arrangement, Deltron sold manufacturing packages to several individual investors who agreed to manufacture automobile hood scoops out of polyurethane, using equipment and supplies provided by Deltron. Many of these investors attempted to produce these hood scoops in their garage at home. Deltron agreed to buy the hood scoops from the investors and represented that Deltron had contracts to resell the items to auto parts stores and directly to auto manufacturers.

In order to attract investors, Deltron placed advertisements in several northern newspapers. The advertisements included Deltron's telephone number in Tampa and advised interested parties to call collect. A Deltron salesperson in the caller's area then would contact the prospective investor and attempt to convince him to become involved in manufacturing hood scoops. After the individual signed a contract to invest the required $7,900, he would fly to Deltron's facilities in Tampa for instruction on the manufacturing process.

After this training, the investor could choose whether to continue with Deltron, or to withdraw and to receive a partial refund of the $7,900. Investors deciding to continue their involvement returned home and awaited delivery of equipment and supplies for the manufacturing.

The defendants made numerous representations to prospective investors that induced them to join the manufacturing venture. As the indictment alleged, some of these representations were (1) that Deltron would provide, in a timely fashion, the necessary equipment and supplies for the manufacture of the hood scoops, (2) that Deltron would purchase the hood scoops produced by the investor, and (3) that Deltron had contracts with various other companies for the resale of hood scoops. The indictment also alleged that the defendants knew that these representations were false and fraudulent when made to the investors.

## II. ISSUES

This case presents ten issues: (1) whether the district court improperly required the

simultaneous exercise of peremptory challenges to the jury, (2) whether the district court properly admitted the statements of each defendant against the other defendant, as statements by a co-conspirator, (3) whether certain statements by a Deltron salesman were properly admitted, (4) whether the district court improperly admitted evidence of Tietjen's association with a company evidently similar to Deltron, (5) whether the district court improperly restricted Tietjen's cross-examination of a federal agent, (6) whether the government adequately demonstrated that certain interstate telephone calls and interstate travel occurred, (7) whether some of the government's statements in closing argument were overly inflammatory, (8) whether Tietjen's closing argument to the jury was overly curtailed, (9) whether the district court should have stricken the government's position statement on sentencing, and (10) whether the district court improperly pressured the defendants to admit their guilt and then imposed a harsher sentence for their failure to do so.

## III. JURY SELECTION

Roe contends that the district court improperly required the government and the defendants to exercise simultaneously their peremptory challenges to prospective jurors. Roe points out that of the defendants' ten challenges and the government's six challenges, two challenges overlapped. Because of this overlapping, Roe argues that he was improperly deprived of two other challenges that he would have made had he been aware of the government's challenges. We uphold the district court's requirement that the government and the defendants exercise their peremptory challenges simultaneously.

▮▮▮▮ The district court's decision as to the order in which the government and the defendant exercise their peremptory challenges under Fed.R.Crim.P. 24(b) is reviewable only for abuse of discretion. *United*

*States v. Durham*, 587 F.2d 799, 801 (5th Cir. 1979). Moreover, the former Fifth Circuit has specifically held that in its discretion, the district court may require the government and the defendant to exercise their peremptory challenges simultaneously.[1] *United States v. Sarris*, 632 F.2d 1341, 1343 (5th Cir. 1980); *accord, Carbo v. United States*, 314 F.2d 718, 748 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). *See generally Criminal Procedure Project, 1980–81 Term*, 70 *Geo. L.J.* 365, 677–78 (1981) (discussing *Sarris* and district court's broad discretion over method of exercising peremptory challenges). In conjunction with Tietjen, Roe exercised all of the ten peremptory challenges to which he was entitled under Fed. R.Crim.P. 24(b). We cannot agree that he suffered undue prejudice simply because "the government united with him in excluding particular persons from the jury." *Pointer v. United States*, 151 U.S. 396, 412, 14 S.Ct. 410, 416, 38 L.Ed. 208 (1894); *see Carbo v. United States*, 314 F.2d at 748 (simultaneous challenges not improper under Fed.R.Crim.P. 24(b) even though same prospective jurors might have been challenged by both sides) (citing *Hanson v. United States*, 271 F.2d 791, 793 (9th Cir. 1959) (defendant not entitled to two additional challenges simply because government and defendant simultaneously challenged same two prospective jurors)). Accordingly, we hold that the district court here did not abuse its discretion in requiring the government and the defendants to exercise their peremptory challenges simultaneously.

## IV. CO–CONSPIRATOR STATEMENTS

Each defendant contends that the district court improperly admitted against him the statements of his co-defendant as statements by a co-conspirator. The district court did not conduct a hearing outside the presence of the jury to determine whether the challenged statements should be admit-

---

1. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

ted. Instead, the district court admitted the statements subject to the government's promise to "connect them up" by laying a proper independent foundation for the statements during the course of trial. The district court did not expressly conclude that it was not reasonably practical to require the necessary independent showing before admitting the statements. However, at the conclusion of the government's case, the district court found that the government had produced substantial independent evidence showing that a conspiracy existed between the defendants and that the statements were made in furtherance of the conspiracy. T–873. In addition, at the conclusion of all the evidence, the district court found that by a preponderance of the independent evidence, a conspiracy existed between the defendants and the statements were made in furtherance of the conspiracy. T–1011–12. We conclude that the challenged statements were properly admitted against both defendants as statements by co-conspirators under Fed.R.Evid. 801(d)(2)(E).

■ We cannot agree with the defendants' argument that the district court's failure to conduct a hearing outside the presence of the jury before admitting the challenged statements, by itself, requires a new trial. In *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the former Fifth Circuit, sitting en banc, established the "preferred order of proof" concerning the admission of co-conspirator statements. Under the *James* standards, the initial admissibility of co-conspirator statements depends upon whether the government can produce substantial independent evidence showing that a conspiracy existed between the defendant and the declarant, and that the statements were made during the course of and in further-

ance of the conspiracy. *Id.* at 581. Because the district court "normally" should make this threshold determination before the jury hears the challenged statements, *id.*, the procedure by which the district court makes this determination has come to be known as a "*James* hearing."

The *James* court also stated that if the district court concludes that a *James* hearing is not reasonably practical, the district court could admit the statements subject to the government's "connecting them up" with enough independent evidence by the end of trial. *Id.* at 582. In either situation, however, the *James* court cautioned that on appropriate motion at the conclusion of all the evidence, the district court must determine that by a preponderance of the independent evidence, a conspiracy existed between the defendant and the declarant and the statements were made in the course of and in furtherance of the conspiracy. *Id.*

At least one post-*James* case has suggested that a *James* hearing is required. *See United States v. Grassi*, 616 F.2d 1295, 1300 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980) (*James* hearing "mandated"). However, the *James* case itself does not indicate that such a hearing is absolutely essential. Throughout the opinion, the *James* court referred to the new standards as the "preferred order of proof" and as a procedure that the trial court "should" follow. In addition, the *James* court expressly permitted the district court to dispense with the *James* hearing upon concluding that the hearing was not reasonably practical, subject to the government's connecting up the statements with a preponderance of independent evidence by the end of trial.[2] 590 F.2d at 582. Moreover, former Fifth Circuit cases subsequent to *Grassi* have established that the failure to hold a *James* hearing, by itself, is not reversible error. *United States v. Ricks*,

2. To be sure, a district court should not lightly forego the advantages of a *James* hearing. Because a *James* hearing is conducted outside the jury's presence and before the admission of the statements, the hearing (1) reduces the risk to the defendant that the jury will hear statements later shown to be inadmissible for lack of prop-

er independent evidence, and (2) decreases the chance that a mistrial will be needed to eliminate the prejudice that may thereby result, with the "inevitable serious waste of time, energy and efficiency" that accompanies a mistrial. *United States v. James*, 590 F.2d at 582.

639 F.2d 1305, 1310 (5th Cir. 1981) (failure to hold *James* hearing not per se reversible error); *United States v. Ocanas,* 628 F.2d 353, 359–60 (5th Cir.), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1980) (same). Finally, this court has adhered to the former Fifth Circuit's rule concerning the failure to hold a *James* hearing. *United States v. Miller,* 664 F.2d 826, 827–28 (11th Cir. 1981) (citing *United States v. Grassi, supra, United States v. Ricks, supra,* and *United States v. Ocanas, supra*). Thus, we hold that the district court's failure to hold a *James* hearing in this case, by itself, is not reversible error.

■ We also cannot agree with the defendants' second argument that the district court's failure to expressly determine that a *James* hearing was "not reasonably practical," by itself, requires a new trial. We do not read *James* to impose an absolute requirement that the district court expressly make this "impracticality" finding before deciding to forego the *James* hearing. However, we note that the normal applicability of this impracticality test underscores the significant preference accorded to the *James* hearing. Yet, the impracticality finding is simply part of the "preferred" procedure that the *James* court chose to reduce the problems associated with the admission of co-conspirators' statements. Accordingly, we hold that the district court's failure to expressly determine that a *James* hearing was not reasonably practical in this case, by itself, is not reversible error.

■ The defendants' final attack on the admissibility of the challenged statements focuses on the district court's finding, at the conclusion of all the evidence, that a preponderance of independent evidence established (1) that a conspiracy existed between the defendants, and (2) that the statements were made in the course of and in furtherance of the conspiracy. *United States v. James,* 590 F.2d at 582. In reviewing this finding, we apply the test for the existence of a conspiracy articulated in two recent cases of the former Fifth Circuit involving a *James* hearing:

The essence of a conspiracy is the agreement to engage in concerted unlawful activity. To connect the defendant to a conspiracy, the prosecution must demonstrate that the defendant agreed with others to join the conspiracy and participate in the achievement of the illegal objective.

*United States v. Grassi,* 616 F.2d 1295, 1301 (5th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980), *quoted in United States v. Perry,* 624 F.2d 29, 31 (5th Cir. 1980). Further, in reviewing the preponderance question as to each defendant, we also consider, but only against the particular defendant-declarant, the statements that he himself made to others. A defendant's own statements are admissible against him as party admissions under Fed.R.Evid. 801(d)(2)(A). *United States v. Hewitt,* 663 F.2d 1381, 1388 (11th Cir. 1981). Thus, a defendant's own statements constitute independent evidence for the purpose of applying the *James* standards as to that particular defendant. As to each defendant here, considering his own statements (but not the statements of his co-defendant) together with the other independent evidence, we conclude that the district court's preponderance finding is amply supported by the record. We thus find no error in this regard.

Both defendants were directors and shareholders of Deltron. From the beginning of Deltron's organization, both defendants were extensively involved in the daily operations of the business. The testimony of Dennis O'Madigan, a consultant hired by Deltron, is illustrative of the independent evidence produced by the government to satisfy its preponderance burden. O'Madigan testified in much detail as to his relationship with both defendants, which lasted for several months. He worked closely with the both of them in developing (1) the specifics of Deltron's contractual relationship with its investors, and (2) the newspaper advertisements that lured the investors to Deltron. With the aid of materials provided by both defendants, he developed the manufacturing package that was sold to investors. Although both defendants told O'Madigan that Deltron had contracts for

the resale of hood scoops, both later told him that they had no intention of getting such contracts. Both defendants also told O'Madigan that they had no intention of buying back the hood scoops produced by the investors. Both defendants also told him that they had hired Ron Dickey, a Deltron salesman for Ohio, for the express purpose of "finding" that 90% of the hood scoops submitted by the investors were defective.[3]

Roe's secretary also testified about some of the office practices in which she engaged on Roe's instructions. Whenever an investor would call Roe, with complaints about receiving supplies or about problems in the manufacturing process, Roe would not take the phone or would himself, using an alias, tell the caller that Roe was not in. In one instance, Roe expressly and vividly conveyed to his secretary his total lack of concern about an investor's problems. Roe also directed his secretary to pay only some of the investors for the hood scoops that Deltron actually did accept.

Tietjen's continuing involvement in Deltron's business was equally extensive and detailed. As just one illustration, Tietjen interviewed, selected, and trained individuals for the Deltron salesperson positions. These individuals played a significant role in convincing prospective investors to accept Deltron's manufacturing package.

In light of the above evidence, we conclude that the district court properly found that by a preponderance of the independent evidence, a conspiracy existed between Roe and Tietjen. In addition, having reviewed each of the challenged statements, we further conclude that by a preponderance of the independent evidence, each statement was made during the course of and in furtherance of the conspiracy. Accordingly, we hold that each defendant's statements were properly admitted against the other defendant as co-conspirator declarations under Fed.R.Evid. 801(d)(2)(E).

**3.** Several investors testified about the low acceptance rate for the hood scoops that they

## V. STATEMENTS BY DELTRON'S SALESMAN

The defendants contend that the district court improperly admitted statements made to investors by Ron Dickey, a Deltron salesman. The defendants argue that the government did not establish a sufficient predicate (1) of agency authorization, or (2) of conspiracy between the defendants and Dickey, as required by *James*. We conclude that the district court properly admitted the statements.

Nearly all of Dickey's statements constitute misrepresentations made to investors concerning the availability of certain equipment and supplies, the rejection of hood scoops manufactured by the investors, and contracts for the resale of the hood scoops. Dickey himself did not testify. Instead, the investors to whom he spoke related his statements. According to them, Dickey said that Deltron could not send the initial batch of hood scoop molds to its investors or repair damaged molds because its mold makers were on strike. Dickey also said that the hood scoops rejected by him on behalf of Deltron were of unacceptable quality. Further, Dickey told prospective investors that Deltron had contracts to resell the hood scoops with auto manufacturers, auto parts stores, and a marketing agency. The government eventually demonstrated that all of these statements were misrepresentations.

We cannot agree that the admissibility of Dickey's statements depended upon whether the government established the *James* predicate. Most of the challenged statements simply were not hearsay, because the government did not introduce them to prove the truth of the matter asserted. *See United States v. Toney*, 605 F.2d 200, 207 (5th Cir. 1979), *cert. denied*, 444 U.S. 1090, 100 S.Ct. 1055, 62 L.Ed.2d 779 (1980) (misrepresentations by salesmen about product not hearsay). Indeed, the government sought to prove that Dickey's

brought to Deltron's warehouses.

representations (1) about the availability of equipment and supplies, (2) about the reason for rejecting hood scoops produced by the investors, and (3) about the existence of resale contracts, were false, were intended to deceive, and in fact did deceive investors into participating and continuing in the production of hood scoops for Deltron. As to these statements, no *James* predicate was required because "*James* applies only to *hearsay* statements by co-conspirators." *United States v. Wilson*, 657 F.2d 755, 760 (5th Cir. 1981) (emphasis in original). Further, any hearsay statements by Dickey were fully admissible under Fed.R.Evid. 801(d)(2)(D), as statements by a servant within the scope of his employment. No *James* predicate was required as to these hearsay statements either, because *James* is limited to the admissibility of evidence under Fed.R.Evid. 801(d)(2)(E), the co-conspirator rule. *United States v. Hewitt*, 663 F.2d 1381, 1388 (11th Cir. 1981).

The government laid an ample foundation for the admission of any of Dickey's hearsay statements under Fed.R.Evid. 801(d)(2)(D). Tietjen himself introduced Dickey to O'Madigan, a Deltron consultant, as Tietjen's "sales representative in the Cleveland area." Roe's secretary also characterized Dickey as a Deltron salesman. Moreover, another Deltron salesman testified that he was fired by Dickey and that Dickey then replaced him. Several salespersons, at least some of whom were interviewed, selected and trained by Tietjen, testified that the job of a Deltron salesman was to sell the manufacturing package to prospective investors. The scope of Dickey's employment also extended to the acceptance and rejection of hood scoops manufactured by investors. Both defendants told O'Madigan that Dickey was sent to Ohio to "find" that 90% of the hood scoops were defective. All of the statements made by Dickey that the defendants' attack were made either to prospective investors or to investors attempting to sell their hood scoops back to Deltron. Dickey also appears to have been employed as a Deltron salesman at all relevant times.

From the evidence discussed above, we conclude that Dickey was a servant of the defendants, that Dickey's statements concerned matters within the scope of his employment, and that Dickey made the statements during his employment relationship. Thus, we hold that Dickey's statements were fully admissible under Fed.R. Evid. 801(d)(2)(D).

## VI. EXTRINSIC OFFENSE EVIDENCE

The defendants contend that the district court improperly admitted testimony concerning Tietjen's relationship with Stylefoam, a company that evidently operated in a manner similar to Deltron. Apparently, Stylefoam sold manufacturing packages to investors, similar to those sold by Deltron, for the production of decorative plaques out of polyurethane. Before his involvement with Deltron, Tietjen was employed as a salesman for Stylefoam. In a pretrial order, the magistrate in this case ordered the government to provide the defendants with a list of all prior acts of a similar nature to those charged in the indictment, which the government planned to use to prove knowledge or intent under Fed.R.Evid. 404(b). The government never listed the Stylefoam evidence. Although the district court excluded certain documents that evidently would have established a virtual identity of operation between Stylefoam and Deltron, it did permit some testimony on Tietjen's involvement with Stylefoam. The defendants argue that this testimony also should have been excluded (1) because the government failed to disclose, pursuant to the pretrial order, its intent to use any Stylefoam evidence, and (2) because the Stylefoam evidence was not an admissible extrinsic offense under FRE 404(b). We conclude that (1) the district court did not abuse its discretion in refusing to impose the sanction of exclusion for the government's failure to disclose, and (2) the Stylefoam testimony was admissible under FRE 404(b).

As a threshold matter, the government contends that the Stylefoam evidence was not an extrinsic offense under

FRE 404(b). The government argues that because the government did not attempt to prove (1) that Stylefoam in fact did engage in fraud, or (2) that Tietjen himself engaged in fraud while employed by Stylefoam, the Stylefoam evidence did not rise to the level of an extrinsic offense under Fed. R.Evid. 404(b). However, an extrinsic activity is considered an extrinsic offense under Rule 404(b) whenever the activity "reflects adversely" on the defendant's character. No clear demonstration of criminal liability is required. *United States v. Beechum*, 582 F.2d 898, 902 n.1 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). Here, the government elicited testimony from O'Madigan that Tietjen had said that Stylefoam "had some trouble" and was "under investigation by the Attorney General's office" at the time Tietjen left Stylefoam to help organize Deltron. We view this testimony as transforming the Stylefoam evidence into an extrinsic activity reflecting adversely on Tietjen's character. Thus, the Stylefoam evidence was an extrinsic offense, subject to disclosure under the terms of the magistrate's order and restricted by the provisions of Rule 404(b).

The government's purpose in introducing the Stylefoam evidence was to counter the defendants' contention that Deltron failed and investors lost their money because the defendants did not know how to operate a relatively complex franchising, supply, buyback, resale and marketing business like Deltron. The Stylefoam evidence thus was introduced to demonstrate that the defendants did have some prior knowledge and experience of how to run a business like Deltron, thus negating the defendants' contention that they were innocent bumblers.

■ The defendants first argue that the district court should have completely excluded all references to Stylefoam because the government did not disclose the intent to use this evidence, as ordered by the magistrate. Such a sanction for failure to comply with discovery orders is permitted by Fed.R.Crim.P. 16(d)(2). However, a district court's refusal to impose such a sanction is reviewable only for abuse of discretion. *United States v. Houde*, 596 F.2d 696, 701 (5th Cir.), *cert. denied*, 444 U.S. 965, 100 S.Ct. 452, 62 L.Ed.2d 377 (1979); *United States v. Campagnuolo*, 592 F.2d 852, 858 (5th Cir. 1979).

■ We cannot agree that the district court here abused its discretion. The district court granted the defendants' request to exclude documentary evidence that would have established a close similarity between Stylefoam and Deltron.[4] Thus, the defendants were not faced with the unexpected need to present extensive countervailing evidence establishing dissimilarity. Given that the defendants were largely successful in excluding most of the evidence connecting Deltron with Stylefoam, we conclude that the district court did not abuse its discretion in admitting some testimony that the defendants had some idea of how to organize a business like Deltron, before the company began operations.

■ The defendants also argue that the Stylefoam testimony permitted by the district court was inadmissible under FRE 404(b). Only two witnesses testified as to Tietjen's association with Stylefoam. One was a Deltron investor who answered a Stylefoam advertisement and eventually was put in contact with Tietjen, a salesman for Stylefoam at the time. Although Tietjen made a sales pitch for Stylefoam, Tietjen then told the investor that Tietjen

---

4. The district court excluded a packet of materials that the government alleged was given to prospective Stylefoam investors and was "very similar" to the packet given to prospective Deltron investors. The Deltron packet included a training schedule for investors at Deltron's Tampa facilities, an equipment and materials list, the detailed contract between Deltron and the prospective investor, favorable credit references, and letters of membership in trade organizations. Assuming a similarity between the packets, the admission of the Stylefoam packet would have established a great degree of identity between the two businesses. The district court also excluded Stylefoam's newspaper advertisement, which also was allegedly similar to Deltron's.

was starting Deltron, a corporation "very similar in style" to Stylefoam, but with different products, primarily hood scoops. The investor did not testify as to any details of Stylefoam's operation. Instead, he concentrated on the vision of Deltron's organization that Tietjen described. The other witness who testified on Stylefoam, O'Madigan, also gave no details of Stylefoam's practices. He testified that he developed the Deltron advertisements using "information" derived from Stylefoam, which had the "same general format" as Deltron. He also said that he developed part of the Deltron packet, which was given to prospective investors, from the Stylefoam packet. Some of the Stylefoam packet was used "verbatim." We conclude that this testimony was admissible to demonstrate that the defendants had some knowledge and experience of how to run a business like Deltron.

▮▮ A district court's decision on the admissibility of extrinsic offense evidence under FRE 404(b) is reviewable only for abuse of discretion. *United States v. Dothard*, 666 F.2d 498, 501 (11th Cir. 1982). Extrinsic offense evidence is admissible only if (1) the evidence is relevant to an issue other than the defendant's character, and (2) the probative value of the evidence is not substantially outweighed by undue prejudice. Relevancy under the first step includes (1) an adequate showing that the defendant actually committed the extrinsic offense, and (2) a similarity between the extrinsic and the charged offense that is significant for the purpose for which the extrinsic offense is introduced. The balance required under the second step includes consideration of the government's need for the evidence, the degree of similarity between the extrinsic and the charged offense, and the closeness in time of the two. *United States v. Mitchell*, 666 F.2d 1385, 1388–90 (11th Cir. 1982); *United States v. Dothard*, 666 F.2d 498, 501–02 (11th Cir. 1982); *United States v. Guerrero*, 650 F.2d 728, 733–34 (5th Cir. 1981); *United States v. Satterfield*, 644 F.2d 1092, 1094–95 (5th Cir. 1981); *United States v. Beechum*, 582 F.2d 898, 911–15 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

The Stylefoam testimony satisfied the two-step predicate for admissibility under FRE 404(b). Tietjen was employed by Stylefoam and had access to the materials given to prospective Stylefoam investors, showing that he "committed" the extrinsic activity. On the similarity issue, we consider it important that the government did not introduce the Stylefoam testimony in order to establish that the defendants were sophisticated businessmen in the franchising field. The government's purpose was only to show that the defendants had some prior knowledge and experience of how to run a business like Deltron, which was relevant to negate the defendants' argument that they were innocent bumblers. For this limited purpose, the general similarity of Stylefoam and Deltron shown by the government was sufficient. Also, Tietjen's involvement with Deltron began at least immediately after he ended his association with Stylefoam, if not before. In our view, the probative value of the Stylefoam evidence was not substantially outweighed by any undue prejudice. Indeed, in our view, the prejudice was minimal. Accordingly, we hold that the district court did not abuse its discretion under FRE 404(b) in admitting the Stylefoam testimony.

## VII. LIMITATION ON CROSS–EXAMINATION

▮ Tietjen contends that the district court improperly restricted his cross-examination of an FBI agent, Ronald Jordan, concerning an interview between Jordan and the defendants. On direct examination, the government asked Jordan, a federal investigator, about a conversation he had with the defendants. This inquiry was only preliminary to the major reason for Jordan's testimony, which was the introduction of a certain chart that Jordan had developed in part from documents given to him by the defendants during his conversation with them. The chart listed most of the investors that actually began production of

hood scoops for Deltron, summarized the amounts that Deltron actually paid the investors for the hood scoops, and calculated how much Deltron should have been paying them, according to its projected schedule of buy-backs. The following exchange occurred between the government's counsel and Jordan about his conversation with Tietjen:

GOVERNMENT: Did you also talk to Mr. Tietjen?

JORDAN: Yes, I did.

GOVERNMENT: What, if anything, did Mr. Tietjen tell you about Deltron's buy-back plan?

JORDAN: He said that to that date, they had bought back all products which met specifications from their franchisers.

GOVERNMENT: Did he tell you anything about contracts with Datsun or J. C. Whitney?

JORDAN: Well, he said they never had one and that neither he nor anyone else had ever said they had one.

GOVERNMENT: Did he tell you anything about the nature of Deltron's business?

JORDAN: Yes, they went over what Deltron did.

GOVERNMENT: Did he tell you it was legitimate?

JORDAN: Yes, he did.

. . . . .

GOVERNMENT: Now, when Mr. Tietjen gave you Government's [Exhibit] 43 along with other materials, did he say anything to you?

JORDAN: Well, this was part of the total conversation and was just an item he gave me as to my inquiries about Deltron Industries.

T–786–88. Evidently, the conversation between Jordan and the defendants had been recorded and a transcript prepared, which defense counsel possessed. On cross-examination, Tietjen attempted to elicit from Jordan further exculpatory statements that Tietjen allegedly made, in an effort to demonstrate that Tietjen did not have criminal intent. The district court restricted Ti-

etjen's cross-examination to the statements that Jordan gave in response to the government's questions as to what Tietjen said. We need not reach the issue of the propriety of this restriction on cross-examination, because any error in this regard was harmless beyond a reasonable doubt.

Every response that Jordan gave to the government's questions, concerning Tietjen's statements during the conversation, was either exculpatory or neutral as to Tietjen's intent. Indeed, as related by Jordan, Tietjen's statements could leave no juror with any impression other than that at the time of the conversation, Tietjen believed he was not guilty of any misconduct arising from his relationship with Deltron. Tietjen gave exculpatory responses as to two of the government's major theories of fraud: the purchase of hood scoops by Deltron and the existence of resale contracts. Tietjen also characterized Deltron as a "legitimate" business. The government did not obtain from Jordan any indications that Tietjen made inculpatory statements. Moreover, a juror would not be likely to lose sight of the fact that these exculpatory statements were brought out by the government, rather than by Tietjen, which would indicate to the juror that Tietjen probably did not make any inculpatory statements. The district court did permit Tietjen to inquire further into these particular statements, but Tietjen's counsel professed not to recall Jordan's testimony on this point and thus declined to do so. On these facts, we conclude that the restriction on cross-examination of Jordan, if error at all, was harmless beyond a reasonable doubt.

## VIII. PROOF OF ALLEGATIONS IN BILL OF PARTICULARS

▮▮ Roe contends that the government introduced no evidence to establish that two interstate phone calls were made and that two instances of interstate travel occurred, as alleged in the government's Bill of Particulars. Thus, Roe argues, the government failed to prove essential elements of the offenses charged. Specifically, Roe asserts

that the government introduced no evidence that (1) someone placed a phone call from New Jersey to Florida, (2) William Nash traveled from New Jersey to Florida, (3) someone placed a phone call from Ohio to Florida, and (4) Ronald Lopeman traveled from Ohio to Florida. In deciding Roe's challenge to the sufficiency of the evidence,

> [W]e must view all the evidence, direct and circumstantial, in the light most favorable to the government, and must accept all reasonable inferences and credibility choices that tend to support the jury's verdict.... The standard of review is whether a jury could reasonably find that the evidence was inconsistent with every reasonable hypothesis of innocence or, put another way, whether a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt.

*United States v. Marx*, 635 F.2d 436, 438 (5th Cir. 1981) (citations omitted), *quoted in United States v. Glasgow*, 658 F.2d 1036, 1040 (5th Cir. 1981). We conclude that no reasonable jury would necessarily entertain a reasonable doubt that the calls were made and the travel occurred in the manner stated in the government's Bill of Particulars.

The evidence established that in August, 1976, William Nash placed a telephone call from New Jersey to Florida for the purpose of learning more about Deltron's advertised business opportunity. Nash lived in New Jersey in 1976. In August, 1976, he read an advertisement in the *Philadelphia Inquirer* concerning a "business investment opportunity for light manufacturing" and he "called the number and the name referred to in the advertisement." T–205. The government introduced a newspaper advertisement that Nash identified as the one he read in the *Inquirer*. (Government's Exhibit 14; T–271). Both defendants expressly stated that they had no objection to the admission of the advertisement into evidence. T–271. The telephone number printed in the advertisement and used by Nash is the same number that both defendants stipulated was used by Deltron in Tampa, Florida, from June 8, 1976, to Octo-

ber 7, 1976. We also note that the area code of the number in the advertisement ("813") is the same area code listed in the telephone directory for Tampa. Although Nash reached only an answering service when he called Deltron's number, Nash testified extensively about how he became involved in Deltron's business as a result of his first phone call. In addition, although Nash did not expressly state that he called Deltron from a telephone located in New Jersey, a reasonable inference from the evidence is that Nash did call from New Jersey. Nash lived in New Jersey at the time he called Deltron, and he read the advertisement in the *Inquirer*, a newspaper distributed in Philadelphia, Pennsylvania, located just across the New Jersey border.

The evidence also establishes that on September 1, 1976, Nash traveled from New Jersey to Florida, for the purpose of learning how to make hood scoops for Deltron. On August 30, 1976, Nash signed a contract with a Deltron representative in Pennsylvania. Nash testified that "arrangements were made for [him] to travel to Tampa on September 1 [1976]." T–210. Nash also testified that while he was at Deltron, he observed the manufacturing process and actually made some hood scoops himself. Although Nash did not expressly state that he began his travel to Florida from New Jersey, a reasonable inference from the evidence is that he did begin his travel in New Jersey, because Nash lived in New Jersey throughout 1976.

The evidence also establishes that in the summer of 1976, Ronald Lopeman placed a telephone call from Ohio to Florida for the purpose of learning more about Deltron's advertised business opportunity. At the time he called, Lopeman lived in Ohio. He read an advertisement "pertaining to Deltron" and containing an "813 number" printed in the *Akron Beacon Journal* of Akron, Ohio. He called the number and was referred to a Deltron representative near Cleveland, Ohio. T–388. The government introduced several pages of the Akron newspaper, printed during July and August, 1976, containing an advertisement that is

virtually identical to the *Philadelphia Inquirer* advertisement seen by Nash. (Government's Exhibit 42; T–715). The Akron advertisements include the same telephone number that the defendants stipulated was Deltron's number in Tampa, Florida. Lopeman testified extensively about how he gradually became involved with Deltron as a result of his phone call to Florida. Although Lopeman also did not expressly state that he called Deltron from a telephone located in Ohio, a reasonable inference from the evidence is that Lopeman did call from Ohio. He lived in Ohio, and obtained Deltron's number from an Ohio newspaper.

The evidence also establishes that in early September, 1976, Lopeman traveled from Ohio to Florida, for the purpose of learning how to make hood scoops for Deltron. On August 26, 1976, Lopeman signed a contract with a Deltron representative in Ohio. Lopeman testified that he and his son then traveled to Tampa in early September, 1976. T–394–95. Even though Lopeman did not expressly state that he began his travel in Ohio, a reasonable inference from the evidence is that he did begin his travel in Ohio. First, Lopeman lived in Ohio. Second, the defendants introduced a document detailing Lopeman's flight arrangements between Akron and Tampa. (Defendants' Exhibit 45, p. 4).

The evidence discussed above clearly indicates that the government met its burden of proof concerning the four challenged allegations in the government's Bill of Particulars. Accordingly, we hold that Roe's contentions to the contrary are without merit.

## IX. GOVERNMENT'S CLOSING ARGUMENT

The defendants contend that in closing argument, the government improperly appealed to the sympathies of the jury, using evidence that was improperly admitted. The defendants complain of the following statements by the government:

> ... Mr. Nash, not to be confused with Mr. Lopeman, Mr. Nash had a son that had cataract problems that he wanted his

son to get involved. Mr. Lopeman had a son that was in athletics in school and tried to get the son to be able to make enough money to go to college....

> . . . . .

> ... Mr. Nash, of course, in the meantime had bought a separate contract for his son and his name appears next, Leslie Nash. And Leslie's contract is in evidence. And that's the son that had the eye difficulty....

> . . . . .

> ... It's tragic. And if you don't think it's tragic, all you have to do is think about Mr. Lopeman selling his house to pay off his debts and it's criminal.

T–1048, 1060. The information contained in the government's statements was admitted over the defendants' objection that the testimony was irrelevant under Fed.R.Evid. 401 and overly prejudicial under Fed.R. Evid. 403. We conclude that the admission of the evidence was not an abuse of discretion and that the prosecution's reference to it in closing argument was not an improper appeal to the sympathies of the jury.

The district court's determination of relevancy and of whether the prejudicial effect of the evidence substantially outweighs the relevancy is reviewable only for abuse of discretion. *Ramos v. Liberty Mutual Insurance Co.*, 615 F.2d 334, 340 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981); *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978). Here, the indictment alleged that the investors were induced to purchase Deltron's manufacturing package because of the fraudulent misrepresentations made by the defendants. Nash purchased two Deltron manufacturing packages, for himself and for his son, in order to provide his son with work that did not require good eyesight. Nash's son's eyesight was failing at the time, making it difficult for him to continue with his darkroom work at a film manufacturing company. Lopeman pur-

chased a Deltron package so that his son could have the opportunity to work his way through college. Lopeman mortgaged his house in order to get the money to buy the Deltron package. He eventually had to sell his house to pay off his debts.

■ We conclude that the investors' motives for and actions in connection with participating in Deltron were relevant to the indictment's charge that the investors were fraudulently induced to join Deltron by the defendants' misrepresentations. This evidence tends to show that the investors were not speculators who would participate in a venture like Deltron without fully evaluating the risks. Instead, the evidence shows that the investors were motivated by the important parental concerns of insuring that their son had a job or could attend college. Lopeman risked, and lost, his home in order to join Deltron. Individuals with such motives, and willing to undertake such indebtedness, are more likely to have listened carefully to and to have relied on the defendants' promises (1) of timely shipment of equipment and supplies, (2) of Deltron's repurchase of the hood scoops, and (3) of the existence of resale contracts, before choosing to invest. Thus, the evidence was relevant. We do not view the asserted prejudicial effect of the evidence to have substantially outweighed its relevance. Thus, we hold that the district court did not abuse its discretion in admitting the evidence.

■ Because the evidence was properly admitted, the government was permitted to make appropriate comments on it in closing argument. *United States v. Garza*, 608 F.2d 659, 662–63 (5th Cir. 1979); *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). We do not view the government's comments as constituting an improper appeal to the jury's sympathies toward the investors. The government merely urged (1) that the investors' testimony established that they relied on the defendants' misrepresentations, and (2) that the evidence in the case showed that the defendants were guilty of the offenses charged. Moreover, we note that during the government's argu-

ment, the defendants did not object to the manner in which the government employed the evidence. We hold that the government's comments in closing argument did not unduly prejudice the defendants.

## X. LIMITATION ON DEFENDANT'S ORAL ARGUMENT TIME

■ Tietjen contends that the district court overly restricted the time available for his concluding argument to the jury. The district court's decision as to the amount of time permitted for a closing argument is reviewable only for abuse of discretion. *United States v. Bernes*, 602 F.2d 716, 722 (5th Cir. 1979). Here, the district court asked Tietjen's counsel how much time he needed for closing argument. T–1028. He responded, "about 30 minutes." During the argument, the district court informed Tietjen's counsel that he had five minutes remaining, and then that he needed to conclude his argument. Counsel requested only a "few more minutes," which the district court granted. In a later bench conference, counsel objected to having been "cut short." The district court noted that counsel initially had argued longer than 30 minutes, had continued for five more minutes, and then had received the additional time requested. On these facts, we cannot agree that Tietjen's oral argument time was overly restricted. Accordingly, we hold that the district court did not abuse its discretion in the extent to which the court limited Tietjen's closing argument time.

## XI. GOVERNMENT'S SENTENCING MEMORANDUM

■ Tietjen contests the district court's failure to strike the government's sentencing memorandum, which was filed shortly before the sentencing hearing and which recommended that Roe and Tietjen endure "lengthy incarceration" for their convictions. Tietjen asserts that the memo contained numerous improper statements and considerations that influenced the district court to impose harsher sentences. We uphold the district court's refusal to strike the government's memorandum.

Tietjen has not shown any prejudice from the district court's failure to strike the memo. We cannot agree that the district court gave undue consideration to any of the allegedly improper arguments contained in the memo. The district judge clearly recognized the shortcomings of the memo, stating, "I don't agree with everything that's in the government's memorandum," and observing, "[P]arts of it, the Court would characterize to be improper pressure on the Court." (Supp. Record at 3–4).

Tietjen's contention that consideration by the district court of arguments like those in the memo would have a chilling effect on a defendant's decision to exercise his right to trial, rather than to plead guilty, is similarly without merit. The district court here admonished the government against the indiscriminate filing of sentencing memoranda like the one in this case. Addressing the government's attorney, the district judge said, "I don't encourage [the filing of such memos] ... and in the future, for your benefit, there is ample time after sentencing proceedings for the Government to present [its] views." (Supp. Record at 4). Finally, Tietjen filed a detailed motion to strike that, in the district court's words, "amply responded to" the allegedly objectionable arguments in the government's memo. Accordingly, we hold that the district court did not abuse its discretion in refusing to strike the government's sentencing memorandum.

## XII. PRESSURE TO ADMIT GUILT

The defendants contend that at the sentencing hearing, the district court improperly pressured them to admit their guilt, and then imposed a heavier sentence because they failed to do so. Because of these alleged improprieties, the defendants urge that they are entitled to resentencing. We conclude that the district court did not improperly pressure the defendants to admit their guilt, and did not impose a heavier sentence for their failure to do so.

Before imposing sentence, the district court gave each defendant the opportunity to make a statement in his own behalf.

The following exchange occurred between Roe and the district court:

ROE: The only thing I would like to say, Your Honor, is that I'm just extremely sorry. Thank you.

THE COURT: All right, Mr. Roe, you apparently, although you did not testify in the case, had taken a position, at least it was the theory of your attorney, that you were honest business men and involved in a venture and the venture failed and that was basically what happened. Is that still your feeling about this?

ROE: Yes, Your Honor, it really is.

Supp. Record on Appeal at 14. No such exchange occurred between Tietjen and the district court, although Tietjen did make a statement in his own behalf.

After imposing sentence, and just after determining whether trial counsel would represent the defendants on appeal, the district court addressed both defendants as follows:

THE COURT: ... Let me say this, gentlemen. I'm a little disappointed at this procedure at this stage to see that both of you feel that you're two honest business men to try the business, the business failed and that's the reason for all these problems. The evidence in this case of your guilt was overwhelming. There is no question as to lies, deceit and deception by both of you gentlemen. You talked, Mr. Tietjen, about all the people that suffered and lost. I didn't hear you mention all of these so-called investors. And these are the people that really lost. The evidence is replete with the use of false names, the lies, deception, and if this is honest business, we're all in a lot of trouble. I say I'm disappointed because the first sign of rehabilitation is the acceptance of the fact that you've done wrong, you're sorry for it and you want to make a new life. I saw no evidence of that in you, Mr. Roe.

Mr. Tietjen, at least you have changed to some degree, and I hope that what you say concerning your new life with your new wife is sincere and that you have

accepted that and that you are going to try to make a new life. I seriously hope that you'll be able to do that.

Supp. Record on Appeal at 27–28. The defendants do not point to any other portion of the transcript to support their arguments that the district court improperly pressured them to admit their guilt or improperly imposed a heavier sentence for their failure to do so.

 A sentencing court has wide discretion as to the factors it may consider in imposing the sentence. *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980). However, the sentencing court may not present the defendant with a choice between admitting his guilt and enduring a harsher sentence for failing to do so. *United States v. Wright*, 533 F.2d 214, 216 (5th Cir. 1976); *United States v. Laca*, 499 F.2d 922, 927 (5th Cir. 1974); *United States v. Rodriguez*, 498 F.2d 302, 312–13 (5th Cir. 1974); *Thomas v. United States*, 368 F.2d 941, 946–47 (5th Cir. 1966). We cannot agree with the defendants' characterization of the district court's comments. The district court did not pressure either defendant to admit his guilt before imposing sentence. As to Roe, the district court merely asked whether Roe adhered to the theory of innocence advanced to the jury by Roe's attorney. After Roe responded affirmatively, the district court did not pursue the matter. We cannot view such a meager exchange to rise to the level of improper "pressure" to admit guilt. As to Tietjen, the district court never asked him whether he also maintained his innocence. Thus, Tietjen was never even faced with the problem of whether to admit or to deny his guilt.

 The district court also did not penalize either defendant for failing to admit guilt. Although the imposition of a sentence that is less than the maximum statutory term is not dispositive of the issue, *United States v. Wright*, 533 F.2d 214, 216 (5th Cir. 1976), we note that the defendants each received a sentence that is one/seventh of what the district court could have imposed. After pronouncing sentence, the district judge indicated his "disappointment" with the defendants' failure to accept that they had "done wrong," which the district court perceived as the "first sign of rehabilitation." However, the full force of this comment applied only to Roe. As to Tietjen, the district court observed that Tietjen had "changed to some degree." The district court's post-sentence comment here is quite similar to a district court's comment in another case, in which the sentence imposed was upheld. *United States v. Rowen*, 594 F.2d 98, 101–02 & n.1 (5th Cir.), *cert. denied*, 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979). In *Rowen*, the sentencing judge indicated his feeling that the defendant was guilty and his "regret that [the defendant] wouldn't admit it," even though found guilty. *Id.* at 101 n.1. The judge in *Rowen* also stated that:

> [T]he trouble is that she [the defendant] is not rehabilitated. That is really the trouble. She won't admit it.

*Id.* In light of *Rowen*, we cannot say that the district court here improperly pressured the defendants to admit their guilt or, in determining sentence, improperly considered the defendants' failure to do so.

We do not view *United States v. Laca*, 499 F.2d 922 (5th Cir. 1974), to require a different result. In *Laca*, the sentencing judge expressly considered, in passing sentence, the lack of "any inclination toward repentance" on the defendants' part, and expressly stated that the judge would favorably consider a motion for sentence reduction only if the defendants' "attitude change[d]" and if the defendants tried "to clear up these matters." *Id.* at 927. In contrast, the district judge here indicated only his personal disappointment with the defendants' failure to accept that they had "done wrong," and made this comment almost as an aside, after determining whether the defendants would need new counsel for their appeal. Without a stronger indication that in determining sentence, the district court considered the defendants' failure to admit guilt, we are not inclined to grant resentencing. Accordingly, we hold that the district court did not improperly

pressure the defendants to admit their guilt and did not improperly impose a harsher sentence for their failure to do so.

For the reasons discussed above, the convictions are AFFIRMED.