UNITED STATES of America, Appellee,

v.

Earl E. HOWARD, Appellant.

No. 82–2118.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 18, 1983.

Decided May 12, 1983.

Rehearing and Rehearing En Banc
Denied June 9, 1983.

McMillian, Circuit Judge, concurred
and filed opinion.

Raymond C. Conrad, Jr. Federal Public Defender, W.D. Mo., Philip M. Moomaw, Asst. Federal Public Defender, Springfield, Mo., for appellant.

Robert G. Ulrich, U.S. Atty., Robert E. Larsen, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before HEANEY, McMILLIAN and AR-
NOLD, Circuit Judges.

ARNOLD, Circuit Judge.

Earl E. Howard appeals from his conviction before a jury in the Western District of Missouri, the Hon. Scott O. Wright presiding, of conspiracy to transport fraudulently obtained securities in interstate commerce in violation of 18 U.S.C. §§ 371 and 2314. On appeal he contests the sufficiency of the evidence to support the verdict, the trial court's refusal to grant a continuance during the trial, and the court's failure to make findings as to admissibility of an alleged co-conspirator's out-of-court statements at the close of the government's case. We affirm.

I.

The gravamen of the indictment is that the defendant, his wife, and others agreed to engage and did engage in a scheme known as "check kiting." The essence of such a practice is the generation of a substantial and false cash flow by the passing of checks among bank accounts at several different banks. The opportunity to generate false amounts of cash arises because, as here, banks often allow their customers to draw on provisional credits created by the deposit of a check from a different drawee bank. The credit does not, of course, become a final one until the check is paid by the drawee bank, and if the money to cover

the check is not in that bank to begin with there is a risk that the credit will never become final.

The defendant was convicted under the first count of an eight-count indictment charging that he and his wife, Helen Howard, conspired to transport in interstate commerce securities with a value in excess of $5,000.00, knowing the securities to have been taken by fraud from the Citizens State Bank of Galena, Kansas. The defendant had for some time been the owner and operator of two automobile auction companies, the Joplin Automobile Auction Company, Inc., of Joplin, Missouri and Dealers Automobile Auction of Tulsa, Oklahoma. The latter company was sold by the defendant to his son, Greg Howard, in 1976. The Joplin Auto Auction originally conducted business through the First National Bank of Sarcoxie, Missouri, while Dealers Auction Company did business primarily through the Union National Bank of Tulsa. Joplin Auto Auction also did business through the Citizens State Bank of Galena, Kansas, where it was the largest depositor. In addition, it was alleged that the defendant and his wife arranged for an account to be opened at the Bank of Carthage, Missouri by Virgil and Dale Hasselbring, who were brothers of Helen Howard. This account was originally funded with proceeds of a loan which the Hasselbrings obtained for Earl Howard's benefit. The Hasselbrings were alleged to have signed checks on the account in blank and given them to the Howards for use in connection with the check-kiting venture. The Hasselbrings were not charged in the indictment.

The government's proof showed many check transactions among the accounts under the control of Earl Howard which were said to have generated a huge false cash flow.[1] The proof as to the count on which Earl Howard was convicted[2] was, however, relatively simple. There was evidence that the defendant caused checks to be drawn on the Dealers Auction account at Union National Bank payable to the Joplin Auto Auction, knowing that the Union National account had insufficient funds to cover these checks. The checks were presented to Citizens State Bank of Galena for immediate credit. Helen Howard then drew checks payable to cash against these provisional credits and Earl Howard used these checks to purchase four money orders from Citizens State Bank on May 5, 6, 7, and 8, 1980. The money orders, which ranged in amounts from $39,500.00 to $45,400.00, were then transported to Missouri, where three were deposited in the Joplin Auction Company account at the First National Bank of Sarcoxie, and one was deposited in the Hasselbring account at the Bank of Carthage.

## II.

Howard first contends the District Court erred in failing to grant his motion for judgment of acquittal because the evidence was insufficient to show beyond a reasonable doubt that a conspiracy existed. This argument is without merit. The defendant's theory is that there was no direct evidence of an agreement between him and anyone else to participate in the scheme. He argues rather that he was the director of everyone else's actions, and that his family members were, at most, unwilling participants. It is certainly true that one cannot be guilty of conspiring with himself. *United States v. Moss,* 591 F.2d 428, 434 (8th Cir.1979). There is ample evidence in this record, however, to support the jury's

1. The kite was finally discovered by a bank examiner during a routine examination at the Union National Bank of Tulsa. This discovery led to deficiencies of some $600,000 for Union National Bank and $400,000 for Citizens State Bank of Galena, all of which were then funded by loans to the Howards. Those loans are now in default with substantial balances remaining.

2. Counts 6, 7 and 8, charging false statements to influence the action of a federally insured bank in violation of 18 U.S.C. § 1014, were previously dismissed with the government's consent. As to the remaining four substantive counts, charging interstate transportation of a fraudulently obtained security, the jury was unable to agree on a verdict, and a mistrial was declared. Proceedings on those counts have been stayed by the District Court pending this appeal.

finding that Earl Howard did agree with Helen Howard and other family members as well to perpetrate the check-kiting scheme, and that he committed one or more overt acts in furtherance of that agreement.

The scheme had evidently been in progress for a number of years. The First National Bank of Sarcoxie, under previous management, seems to have given Howard virtually unlimited check-writing privileges. If his account had insufficient funds to cover the checks, the bank's employees were simply told to hold the checks until a deposit was made. This practice changed in 1978 when the bank was sold and the new management directed that Howard no longer be allowed to draw against provisional credits at the Sarcoxie Bank.

Greg Howard testified that in February, 1979, the defendant's kiting activities became of such serious concern that a family meeting was held at which they attempted to persuade him to stop the kite. He refused. Instead, the kite apparently got larger, and the events described in Count 1 of the indictment were among its results.

Howard also argues that the banks involved were not defrauded because they knew what he was doing all along. The banks' officers denied this, and the jury found against Howard on this point by its verdict of guilty.

The defendant raises two other points which merit little discussion. First, he urges that the District Court erred in refusing to grant him a continuance after the fourth day of trial so that he could locate and produce two additional witnesses. We think it sufficient to say that the decision to grant a continuance, especially in the midst of trial, is vested in the broad discretion of the District Court, and we find no abuse of discretion here.

Finally, Howard complains of the trial court's refusal to make a finding at the close of the government's case as to the admissibility of an out-of-court statement by Helen Howard. The evidence at issue stems from a question asked of government witness Greg Howard, the defendant's son, concerning the February, 1979, family meeting. The United States Attorney asked him if his mother, Helen Howard, had said anything during the meeting. He responded that she virtually begged Earl Howard to stop the scheme. The next day an objection was made to this testimony, and the defendant asked that the government be reminded of the sanctions and procedures dictated by *United States v. Bell*, 573 F.2d 1040 (8th Cir.1978). The District Court expressed some doubt that the statement was in fact hearsay, but agreed to make the findings required by *Bell*. Then, at the close of the government's case, the defendant moved for a mistrial on the basis that the government had not proved the existence of the conspiracy by sufficient evidence *aliunde* to support the admission of the alleged hearsay. In so doing, the defendant asked the District Court to make the required finding which would support or deny admissibility at the close of the prosecution's evidence rather than at the close of all the proof.

This request was specifically contrary to the procedure outlined in *Bell*, which directs the finding be made at the close of all the proof. See 573 F.2d at 1044. Defendant concedes the procedure he urges is contrary to *Bell*. He argues, however, that the *Bell* procedure should be modified so that a defendant is not faced with the dilemma of either foregoing putting on his defense and then appealing the denial of his motion for judgment of acquittal, or putting on his evidence and risking introducing proof which would support admission of the out-of-court statement. This is not an appropriate case to consider the defendant's argument for two reasons. First, no proof was adduced during defendant's portion of the case which tended to support admission of the statement. Hence, he was not harmed by the procedure about which he complains. Second, this panel is without power to modify the procedure set out in *Bell*. Only the Court *en banc* can modify *Bell*.

The judgment of conviction is

Affirmed.

McMILLIAN, Circuit Judge, concurring.

I agree that because no proof was adduced during defendant's case, it was harmless error for the district court to make its finding on the admissibility of the co-conspirator hearsay declarations at the close of all the evidence. I concur and write separately, however, to express my conviction that we should no longer prefer the order of proof established in *United States v. Bell*, 573 F.2d 1040 (8th Cir.1978).

In *Bell*, this court recommended that district courts permit the government to introduce putative co-conspirator hearsay declarations into evidence subject to being "connected up" with later proof that the defendant was involved in a criminal conspiracy with the hearsay declarant. This recommendation was made as a pragmatic concession to the difficulties, expense, and delay that would arise if the government first had to prove the conspiracy before the hearsay could be admitted. Yet, as the Fifth Circuit has realized, *Bell's* preferred order of proof "may be more burdensome and expensive of prosecutorial and judicial effort than a reordering of the proof." *United States v. James*, 590 F.2d 575, 582 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Allowing the government the leisure to connect-up the foundation to the proof at a later time substantially increases the risk that the jury will be exposed to inadmissible evidence that is highly prejudicial. In such instances a mistrial will often be required to eliminate the prejudice a cautionary instruction cannot cure, resulting in the "inevitable serious waste of time, energy and efficiency that accompanies a mistrial." *Id.* at 582; *United States v. Roe*, 670 F.2d 956, 962 n. 2 (11th Cir.1982). *See, e.g., United States v. Coffman*, No. CR 81–0–10 (D.Neb. Nov. 4, 1981) (memorandum order) (where after five calendar weeks of trial, the district court excluded voluminous putative co-conspirator hearsay testimony and dismissed several of the major counts against the defendants because the "record was devoid of any competent independent evidence establishing the existence of a conspiracy."); *United States v. Payner*, 590 F.2d 206, 207 (6th Cir.1979) (detailing the tortuous procedural meanderings the government must undertake in order to appeal an adverse *Bell*-type ruling under 18 U.S.C. § 3731). The great waste inherent in a mistrial may also cause a district court to hesitate granting a mistrial in favor of delegating to the jury the task of determining whether a conspiracy has been adequately proven. *See United States v. Mastropieri*, 685 F.2d 776, 788–89 (2d Cir.1982) (discussing the proper roles of a judge and jury in determining whether a conspiracy exists).

On balance, the dangers that inure from *Bell's* preferred order of proof far outweigh its practical justifications. I favor the adoption of a hybrid of the Fifth and Tenth Circuits' approaches to this problem. The Fifth Circuit strongly prefers that district courts conduct a pre-trial hearing on the admissibility of putative co-conspirator hearsay declarations, but permits the government to connect-up in difficult cases, subject to the district court's finding on admissibility at the close of all the evidence. *See United States v. James*, 590 F.2d at 582–83. The Tenth Circuit also holds that the better practice is for the court to determine the admissibility before the hearsay is admitted. *United States v. DuFriend*, 691 F.2d 948, 951 (10th Cir.1982). *Accord United States v. Roe*, 670 F.2d at 962 n. 3 ("To be sure, a district court should not lightly forego the advantages of a *James* hearing."); *United States v. Jackson*, 627 F.2d 1198, 1218 (D.C.Cir.1980). But in addition, the Tenth Circuit holds that the court should normally make its determination during the government's case-in-chief. *United States v. DuFriend*, 691 F.2d at 951. *Accord United States v. Gantt*, 617 F.2d 831, 845 (D.C.Cir.1980); *United States v. Ziegler*, 583 F.2d 77, 80 (2d Cir.1978). I agree that the government alone should shoulder its burden of proving the defendant's criminal complicity with the declarant. The government should not be able to rely upon the defendant's proof to meet that burden. Nor should the defendant be put to the choice of either challenging the

government's foundation for the hearsay on appeal, or presenting his defense to the jury and thereby run the risk of proving the government's case.

I would strongly recommend that district courts conduct pretrial *James* hearings. But if the government wishes to forego the advantages of a *James* hearing in a particularly difficult case, it should prove the conspiracy during its case-in-chief. The district court should then be required to make a finding on the record whether it is more likely than not that the defendant and the declarant were involved in a conspiracy and that the declarant's hearsay statement was made in furtherance of the conspiracy. If the court finds that it is more likely than not, the defendant should be permitted to present exculpatory evidence on the admissibility issue during its case-in-chief. Finally, at the close of all the evidence, the district court should be required to make the ultimate determination of whether a conspiracy was proved by a preponderance of all the evidence.[1]

We have expressed a preference for pretrial hearings in the past. *See United States v. Macklin,* 573 F.2d 1046, 1049 n. 3 (8th Cir.1978). It has become common practice, however, to allow the government to introduce the hearsay first and lay the foundation for the hearsay's admission into evidence later. It is my judgment that it is time to make a strong pronouncement in favor of holding pre-trial hearings to determine the admissibility of a putative co-con-

spirator's hearsay declaration. Accordingly, I concur.

---

1. At least one court has adopted the argument that the district court cannot make its finding at the close of the government's case because a preponderance standard implicitly anticipates that the defendant's evidence will be taken into account. *See United States v. Winter,* 663 F.2d 1120, 1141 (1st Cir.1981). This argument, however, does not militate against having the district court make an initial "more likely than not" finding on the record at the close of the government's case based upon the government's evidence and the defendant's cross-examination, while withholding an ultimate determination until after the defendant presents his evidence during his case-in-chief. This type of procedure would have the salutory effect of limiting proof of the conspiracy to the evidence presented in the government's case-in-chief. As a pragmatic matter this effect may not be achieved at the trial level. On appeal, however, the reviewing court will be able to scrutinize the district court's initial finding and limit the proof establishing the conspiracy solely to the evidence adduced by the government during its case-in-chief. The appellate court can then weigh that evidence against the defendant's proof that no conspiracy existed or that the statement was not made in furtherance of the conspiracy.

The government may contend that the above procedure is unfair because it should be given a chance to rebut the defendant's exculpatory evidence. If the government has a legitimate concern of surprise, it should opt for a pre-trial *James* hearing where it may be entitled to rebuttal.